CITY OF HOUSTON, Appellant,

v.

Warren Martin HAMONS et al., Appellees.

No. 809.

Court of Civil Appeals of Texas, Houston (14th Dist.).

May 30, 1973.

Rehearing Denied June 27, 1973.

Wm. A. Olson, City Atty., Fred R. Spence, Houston, for appellant.

Harold Lloyd, Karl C. Hoppess, Danny Edwards, Houston, for appellees.

TUNKS, Chief Justice.

This is a condemnation case.

The condemnor is the City of Houston, herein sometimes called the City. The subject property is a 25.266 acre tract of land located about five and one-half miles southeast of the Houston Intercontinental Airport. The owners of the property had operated a private airport on it for about ten years before the Houston Intercontinental Airport was established. The land had on it three grass runways, some small hangars and other structures incidental to the operation of an airport. It was useable by only small single engine planes. It was known as Airman's Field.

The case was tried to a jury. There were two special issues. In answer to the first issue the jury found that the City acted arbitrarily or capriciously in taking the fee simple title to the tract of land in question. In answer to the second issue the jury found that the market value of the land was $130,930. Based upon the jury's answer to the first issue the trial court rendered judgment denying the City's acquisition of the land. The City appealed.

The first thing done by the City toward the acquisition of the defendants' property was the writing of a letter dated April 27, 1967 stating the intention to acquire an "air space easement" so as to cause Airman's Field to be closed.

On May of 1967 a representative of the City called on the owners and offered to pay $5,000 for the "air rights" and the buildings on this property. This offer was rejected by the owners. The representative then said he would try to get authority to pay $10,000. The owners also refused to accept such larger amount. Nothing was said on that occasion concerning the City's acquisition of the fee title to the property.

On June 20, 1967 the City wrote to the owners a letter stating four alternative offers of which the owners were given an option to accept any one. Under all of those alternative options it would result that the owners would retain title to the land subject to the City's acquisition of the air rights over it as established by a covenant running with the land and subject to the requirement that the buildings be removed. The amounts to be paid by the City to the owners varied from $11,962.50 to $16,925. The variables were based upon whether the City or the owners were to retain ownership of the materials in the buildings and which one was to bear the expense of removing them. The letter gave the owners five days within which to accept. The owners did not reply.

On July 7, 1967 the City wrote a letter sent by certified mail to the owners making an offer in the following language:

"The public necessity, created in part by the continued growth of our City, makes it necessary for the City of Houston to acquire the air rights over the above described property in connection with the Houston Intercontinental Airport.

In accordance with authorization by the City Council of the City of Houston, you are hereby offered the total sum of $16,925.00 for exclusive air rights from and above a plane 50 ft. above the surface (or 153 ft. above mean sea level) together with a covenant that neither you nor your heirs and assigns will ever use the captioned parcel for the landing or taking off of any type of aircraft or for airport purposes. This consideration includes the buildings on this property and an allowance for your expense in levelling this land."

The owners did not reply to that offer.

On August 22, 1967 the City sent the owners another letter by certified mail making an offer in the following language:

"The public necessity, created in part by the continued growth of our city, makes it necessary for the City of Houston to acquire the above described property for the Houston Intercontinental Airport.

In accordance with authorization by the City Council of the City of Houston, you are hereby offered the total sum of $60,500 for unencumbered fee merchantable title to your above described property and property rights."

That letter was the City's first indication of an intention to acquire the fee title to the land. The offer was not accepted. On September 24, 1968 the City filed its condemnation statement seeking recovery of the fee title to the property for municipal airport purposes. The commissioners' award found the damage to the owners to be in the amount of $60,500. That sum was paid into the registry of the court and the City took possession of the property and shut down the airport on it. The owners have not withdrawn the money deposited. They filed objections claiming that the City did not negotiate in good faith, that the City acted arbitrarily in taking the fee title to the property and that the amount of damage found by the commissioners was too low.

The evidence in this case would permit the jury to conclude that the City's determination to acquire the fee title to the defendants' property rather than the exclusive air rights over it was the result of a vindictive attitude on the part of the City's employees because of their difficulties in trying to negotiate with the owners. The mayor testified that the only purpose of the City in acquiring the land was to prevent the operation of the airport on it. He said that the decision to take the fee was made after negotiations to acquire an easement had "broken down" because the owners wanted more for the easement than the entire land was worth.

One of the councilmen of the City testified that the first consideration in taking the property was to remove the hazard, but that the City would probably use the surface for a park, a service center for the public works department or some other public use. A City employee, titled Director of Real Estate, testified that the Aviation Department "suggested that an interest be acquired to effectively close these airports." He also testified that it was not the City's intention to use the surface of the property for airport purposes. The only purpose set out in the City's condemnation statement was "municipal airport purposes."

The record shows that the City had effectively closed another small airport in the vicinity by the purchase of an easement. The language of the first letters written to the owners by the City showed that both the City and the F.A.A. considered the acquisition of an easement sufficient to remove the hazard in question. Vernon's Tex.Rev.Civ.Stat.Ann. arts. 46d–2 (1947) and 46e–13 (1951) are authority for the City's acquisition of an air rights easement which would serve the public purpose for which these defendants' property was condemned. In the exercise of that authority the City could have condemned an interest in the defendants' property in the nature of a covenant running with the land. See Texas Electric Service Co. v.

Perkins, 23 S.W.2d 320 (Tex.Comm'n App.1930, jdgmt. adopted).

The action of the City in determining to take the fee title to the defendants' property, rather than an easement, is subject to judicial review for "palpable abuse" of the City's eminent domain power. McInnis v. Brown County Water Improvement Dist. No. 1, 41 S.W.2d 741 (Tex.Civ.App.—Austin 1931, writ ref'd). The evidence in this case showed that the City in taking the surface rights of the defendants' property took property which the City did not need and had no intention to use for municipal airport purposes. Such evidence fully sustains the jury's answer to special issue number one. The City's points of error attacking that finding are overruled. See Franklin County Water District v. Majors, 476 S.W.2d 371 (Tex. Civ.App.—Texarkana 1972, writ ref'd n. r. e.). City of Wichita Falls v. Thompson, 431 S.W.2d 909 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n. r. e.).

The City has presented points of error challenging the evidentiary support for the jury's finding that the property in question had a market value of $130,930. While those points become immaterial upon the sustaining of the finding as to arbitrary or capricious action in the taking, we deem it proper to rule on them.

An appraiser who was called as a witness by the City testified that the land had a value of $80,500 and the improvements had a value of $5,000. One of the defendants testified that the entire property was worth $200,000. A man named Hudson lived and owned property near Airman's Field. He was in the sheet metal business. When he heard that the sheet metal hangars were to be removed he went on the property to explore the possibility of buying them. He had investigated the values of land within the vicinity with the view of buying more land. He was called as a witness by the defendants. He testified that the property had a market value of $131,064. He attributed $31,000 of that

value to the buildings. The City in its brief characterized his testimony as "impartial testimony." An appraiser called as a witness by the defendants valued the land without improvements at $110,000.

The City's points of error challenging the jury's finding as to value are overruled.

Other of the City's points of error relate to the trial court's exclusion from the evidence of letters written by the F.A. A. showing the requirement that Airman's Field be closed as an airport. There are many items in the evidence showing this requirement by the F.A.A. The letter from the City to the owners dated April 27, 1967 by which the City first initiated the acquisition process recited that fact. There was oral testimony showing it. The excluded letters would merely have been cumulative evidence. Their exclusion, if error, was harmless. Tex.R.Civ.P. 434.

The City's brief in this case lists 42 points of error covering 14 pages. (One of the points says that the trial court erred in overruling its motion for partial summary judgment. Other points say that the trial court erred in submitting special issue number 1 over the City's objection that there was not factually sufficient evidence to support an affirmative answer and that an affirmative answer would be against the preponderance of the evidence.) The entire brief is 132 pages long. Despite this plethora of words the City failed to point out a significant fact shown by the record. The trial court's decree adjudges costs against the City and directs that execution issue for their collection. Public policy prohibits the levy of execution against a political subdivision of the state performing governmental functions. National Surety Corp. v. Friendswood Ind. School Dist., 433 S.W.2d 690 (Tex.Sup.1968). This error is fundamental and must be noted despite the appellant's failure to point it out. Ramsey v. Dunlop, 146 Tex. 196, 205 S.W.2d 979 (1947).

The judgment of the trial court is affirmed except insofar as it directs the issuance of execution against the City. It is reformed by the elimination of that direction.

The costs of appeal are assessed against the appellant for two reasons. First, appellant unduly increased the costs by filing a voluminous transcript containing 439 pages—most of which was entirely unnecessary to this appeal. Second, we feel that the error in ordering the writ of execution would have been corrected by the trial judge if it had been called to his attention, which the City did not do. See Denman v. Stuart, 142 Tex. 129, 176 S.W.2d 730 (1944); Missouri Pacific Railroad Co. v. State, 469 S.W.2d 817 (Tex.Civ.App.— Houston (14th Dist.) 1971, writ ref'd n. r. e.); Tex.R.Civ.P. 448.