**CLEAR LAKE CITY WATER AUTHORITY, Appellant,**

v.

**CLEAR LAKE COUNTRY CLUB, L.P. and Plainfield Offshore Holdings XI, Inc., Appellees.**

**No. 01–09–00198–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 24, 2011.

Ramon G. Viada, Viada & Strayer, Woodlands, TX, Barry Abrams, Abrams Scott & Bickley, L.L.P., William E. Schweinle, Jr., Schweinle & Parish, P.C., Houston, TX, for Appellant.

J. Mark Breeding, Andrews & Kurth, L.L.P., George R. Murphy, Justin Hodge, Vinson & Elkins, L.L.P., Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, KEYES, and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

The Clear Lake City Water Authority ("the Water Authority") appeals the trial court's judgment dismissing its condemnation action in which the Water Authority sought to acquire a 178–acre defunct golf course owned by Clear Lake Country Club, L.P. ("the Country Club") for the purpose of constructing a storm water detention facility. On appeal, the Water Authority raises three issues with a number of sub-points. We address the following dispositive issue raised by the Water Authority: whether the trial court erred

when it denied the Water Authority's motion for judgment notwithstanding the verdict which challenged the jury's findings that the Water Authority's determination to take the property for detention purposes was fraudulent and arbitrary and capricious.

We reverse and remand.

## Background

The Water Authority is a water control and improvement district created pursuant to article XVI, section 59, of the Texas Constitution. *See* Tex. Const. art. XVI, § 59. The Water Authority's responsibilities include the control and storage of storm and flood water. *See* Tex. Water Code Ann. § 51.121 (Vernon 2008). To accomplish its defined objectives, the Water Authority has the legislative right to acquire land by condemnation. *See* Tex. Water Code Ann. § 49.222(a) (Vernon 2008).

In the 1960s, Friendswood Development Company, a company owned by Exxon Land Development, developed a master-planned residential community in Clear Lake City. The community is located in the geographical district controlled by the Water Authority. The master-planned community included a 178–acre tract of property ("the Property") on which a golf course was constructed. Deed restrictions were placed on the Property prohibiting it from being used as anything other than a golf course or other recreational facility until the deed restrictions expire in 2021.

In January 2002, the Country Club purchased the Property for $2.3 million. For the next several years, the Country Club operated the Property as a golf course. In early 2005, the golf course became unprofitable. The Country Club announced that it would be closing the facility, seeking removal of the deed restrictions, and selling the Property for residential and commercial development.

In response to the announcement, the Clear Lake City Civic League (the "Civic League") a local civic group, formed a subcommittee named the Green Space Preservation Committee (the "Green Space Committee") to oppose redevelopment of the Property and to preserve it as a green space. At the time, the Water Authority's board of directors ("the Board") consisted of President Gayle Yoder, Vice President John Branch ("Branch"), Secretary Bob Savely ("Savely"), Vince Johnson, and John Ferguson. *See* Tex. Water Code Ann. §§ 49.051, 49.053, 49.102. Two of the Water Authority's directors, Branch and Savely, were also co-chairs of the Green Space Committee.

In the spring of 2005, Savely presented to the Board a draft resolution providing that the Authority unanimously and wholeheartedly supported the Green Space Committee's mission. The Board members generally indicated support for the resolution but decided to have the Water Authority's attorney review it. A board vote was never taken on the resolution.

The Green Space Committee believed that the abandoned golf course served as a de facto detention pond for the area because, when it rained, water would pond on the Property. In April 2005, Green Space Committee co-chair, Katie Chementi, contacted Larry Dunbar, a licensed engineer-hydrologist and attorney, to conduct a study to determine whether this theory was correct. Dunbar provided the Green Space Committee with a proposed engagement agreement. The proposal indicated that the primary purpose of Dunbar's work would be to study the flooding conditions associated with two creeks running through the Property and to determine the potential effect of developing the Property.

Ultimately, the Green Space Committee did not retain Dunbar. Instead, Dunbar was hired by the Water Authority as an engineering consultant to provide hydrology services similar to those he had proposed to the Green Space Committee. In July 2005, Dunbar prepared a report discussing the flooding associated with the two creeks and regarding the effect of redeveloping the Property. Nothing in Dunbar's July report indicated a need for regional detention ponds to be constructed. The following month, an engineering firm hired by the Country Club prepared a report regarding the drainage issues associated with redeveloping the Property. The report indicated that construction of detention facilities on the Property would alleviate any increased drainage resulting from redevelopment and could help flooding in the area generally.

In September 2005, Dunbar prepared a report establishing more stringent standards for redevelopment of the Property. That same month, the Water Authority amended its policies regarding drainage and flood for new development to also apply to redevelopment of property.

In October 2005, the Country Club closed the golf course on the Property.

At the request of the Board, Dunbar conducted a broader study of flooding in the Water Authority's district, specifically flooding along Horsepen Bayou, the larger waterway into which the two creeks on the Property flow. A large portion of the Horsepen Bayou watershed lies within Water Authority's boundaries.

To alleviate flooding in the district, Dunbar recommended that regional detention facilities be constructed on the Property and also on another property south of Ellington Field. Dunbar presented this recommendation to the Water Authority at a November 10, 2005 board meeting in an oral report and in a PowerPoint presentation.

After Dunbar's presentation, the Board unanimously voted to pass a resolution ("the Resolution") directing the acquisition of the Property, and of the property near Ellington Field, by voluntary acquisition or, if necessary, through condemnation proceedings, to establish storm water detention facilities. The text of the Resolution indicates: (1) the Board had consulted with staff and consultants to study existing flooding problems, (2) the Water Authority had received information that substantial detention facilities were necessary to address the Water Authority's existing flood-prone conditions; (3) the two tracts identified are "apparently available and currently unoccupied tracts of land capable of accommodating such detention facilities in a manner most rationally related to the needs of the locations;" (4) the detention facilities "would mitigate current and future flooding problems in a number of subdivisions in Clear Lake City within the [Water] Authority;" and (5) the establishment of the flood control facilities will "significantly decrease current flooding situations" and "will likely lower the high water condition of Horsepen Bayou some two to three feet in 100 year flood events thereby reducing the downstream impact."

Dunbar and Branch met with the Harris County Flood Control District and the City of Houston regarding the detention facilities. At the request of those entities, Dunbar prepared a written report of his PowerPoint presentation in September 2006.

On November 13, 2006, the Country Club filed suit against Exxon Land Development seeking to have the deed restrictions on the Property, precluding residential and commercial development of the Property, declared unenforceable (the "Exxon Suit"). The Civic League and the

Water Authority intervened in the Exxon Suit. The Water Authority and the Civic League were represented in the suit by the same law firm of Wilson, Cribbs & Goren, P.C.

During the Texas Legislature's 2007 session, House Bill 3232 ("HB 3232"), was introduced to address the redevelopment of closed golf courses.[1] HB 3232 required land formerly used as golf courses to be subjected to heightened standards for re-platting, including (i) special public hearings, (ii) findings regarding the sufficiency of infrastructure, and (iii) super-majority approval from the respective municipality if just 20 percent of adjacent homeowners protested the re-plat in writing. *See* TEX. LOC. GOV'T CODE ANN. § 212.0155 (Vernon Supp.2010).

When HB 3232 was scheduled for hearing before the House's Land and Natural Resources Committee, Branch testified before the committee in support of the legislation. Branch did so in his capacities as a representative of the Water Authority and as a representative of the Civic League.

On April 18, 2007, the Water Authority filed a petition in the trial court seeking to obtain the Property by condemnation. The Water Authority alleged that, since early 2005, it had engaged "in a deliberate and well designed process to further reduce and, if possible, eliminate the events and effects of flooding within its geographical boundaries." It asserted that, pursuant to the November 10, 2005 resolution enacted by its board, "the Property was designated as part of acreage to be utilized to reduce and, if possible, eliminate flooding conditions." The petition continues,

The interest sought to be acquired by [the Water Authority] in the Property will be used for a purpose for which [the Water Authority] possess the power of eminent domain; namely, the construction, maintenance, and operation of facilities for the purpose of storm water detention to reduce and control flooding to the maximum extent possible.

. . . .

[The Water Authority] and the owner of the Property have been unable to agree on the value of the land or the damages. [The Water Authority] has heretofore in good faith attempted to reach such agreement with [the Country Club] and further attempts by [the Water Authority] to agree with [the Water Authority] would be futile. Therefore, [the Water Authority] has no recourse but to seek condemnation of the Property.

The trial court appointed three special commissioners to determine the value of the Property. Following a hearing, the commissioners found that the market value of the Property was $14,132,000. The Water Authority filed an objection to the commissioners' award asserting that "the amount of the damages awarded by the Special Commissioners is grossly excessive in that it requires [the Water Authority] to pay [the Country Club] far more than the fair market value of the land taken." The Water Authority further asserted that the commissioners "failed to take into account the Deed Restrictions upon the lands being condemned." The Water Authority requested "that this cause be tried and determined . . . as in other civil cases."

The case was set for a jury trial. Before trial, the trial court determined, as a matter of law, that the purpose for condemning the Property—to establish storm water detention facilities—was a public use. The trial court also determined, as a matter of law, that the Water Authority's

---

1. Act of May 27, 2007, 80th Leg., R.S., ch. 1092, § 1, 2007 Tex. Gen. Laws 3721 (amend-ed 2009) (current version at TEX. LOC. GOV'T CODE ANN. § 212.0155 (Vernon Supp.2010)).

Board had determined that a public necessity existed to take the Property to establish water detention facilities.

Although the parties stipulated that all statutory prerequisites to condemnation had been satisfied, the Country Club asserted, as affirmative defenses, that the Water Authority's determination that it was necessary to acquire the Property for detention purposes was fraudulent and arbitrary and capricious. At trial, the Country Club argued and offered evidence to show that the true reason for the Water Authority's condemnation was not storm water detention but to prevent redevelopment of the Property.

The trial lasted for one month. At the charge conference, the Water Authority offered numerous objections to the jury charge. Among the objections was the Water Authority's argument that the Country Club had to meet a heightened evidentiary burden of proof to prevail on its allegations of arbitrariness and fraud. The Water Authority asserted that the extent to which property is taken by condemnation is a legislative question, not a judicial one, thus implicating separation of powers concerns. The Water Authority also objected to a number of the trial court's definitions and instructions, including the trial court's definition of fraud and arbitrariness.

The jury ultimately agreed with the Country Club, finding that the Water Authority had acted fraudulently and arbitrarily when it decided that the Property should be taken for the purpose of constructing a storm water detention facility. The jury also determined that the fair market value of the Property was $5,100,000. The jury further found that the Country Club had incurred $1,188,000 in

attorney's fees, $126,000 in appraiser's fees, and in $116,000 in "other expenses."

The Water Authority filed a motion for judgment notwithstanding the verdict (JNOV) asserting that no evidence supported the jury's findings that the Water Authority had acted fraudulently and acted arbitrarily and capriciously when it made its determination to acquire the Property. The trial court denied the motion.

Based on the jury's verdict, the trial court rendered judgment dismissing the Water Authority's condemnation proceeding and awarding the Country Club $1,430,000, the sum of its attorney's and appraiser's fees, and other expenses. This appeal followed. On appeal, the Water Authority raises three issues containing a number of sub-points.[2]

### Denial of the Water Authority's Motion for JNOV

Among its appellate challenges, the Water Authority asserts that the trial court erred when it denied its motion for JNOV. The Water Authority asserts that legally-insufficient evidence supports the jury's findings that it acted fraudulently and arbitrarily and capriciously when it determined that condemnation of the Property was necessary for storm water detention.

#### A. Governing Legal Principles

##### 1. Standard of Review

A trial court may disregard a jury's findings and grant a motion for judgment notwithstanding the verdict only when a directed verdict would have been proper. *See* Tex.R. Civ. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991); *B & W Supply, Inc. v. Beckman,* 305 S.W.3d 10, 16 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). We

---

**2.** Plainfield Offshore Holdings XI, Inc. is the lien holder on the Property. Plainfield Off-

shore participated in the trial but has not filed an appellee's brief in this appeal.

review challenges to a trial court's ruling on a motion for JNOV under the same legal-sufficiency test applied to appellate no-evidence challenges. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex.2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–23, 827 (Tex.2005). Applying that standard, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Tanner*, 289 S.W.3d at 830. We also must be cognizant that, "[e]ven though the evidence is viewed in the light most favorable to the verdict, it cannot be considered in isolated bits and pieces divorced from its surroundings; it must be viewed in its proper context with other evidence." *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex.2008) (citing *City of Keller*, 168 S.W.3d at 827)

If more than a scintilla of probative evidence supports the finding, the legal sufficiency challenge fails. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex.2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994). In contrast, evidence that creates no more than "a mere surmise or suspicion of its existence" is only a scintilla and, thus, no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)).

### 2. Relevant Condemnation Law

The applicable eminent domain statute in this case provides,

> A [water] district ... may acquire by condemnation any land, easements, or other property inside or outside the district boundaries ... necessary for water, sanitary sewer, storm drainage, or flood drainage or control purposes or for any of its projects or purposes, and may elect to condemn either the fee simple title or a lesser property interest.

*See* TEX. WATER CODE ANN. § 49.222(a).

With regard to condemnation generally, a governmental entity may prevail on an eminent domain claim only if the condemnation is for a "public use." *Whittington v. City of Austin ("Whittington I")*, 174 S.W.3d 889, 896 (Tex.App.-Austin 2005, pet. denied). "There are two aspects to the 'public use' requirement. First, the condemnor must intend a use for the property that constitutes a 'public use' under Texas law. Second, the condemnation must actually be necessary to advance or achieve the ostensible public use." *Id.*

We have previously recognized, "The condemnor's discretion to determine what and how much land to condemn for its purposes—that is, to determine public necessity—is nearly absolute." *Malcomson Road Util. Dist. v. Newsom*, 171 S.W.3d 257, 268 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). When, as here, a statute vests a governmental entity with discretionary authority to condemn, the entity's determination of public necessity is presumptively correct, absent proof by the landowner of the entity's fraud or proof that the condemning authority acted arbitrarily or capriciously in its condemnation of the property. *See FKM P'ship, Ltd. v. Bd. of Regents of the Univ. of Houston Sys.*, 255 S.W.3d 619, 629 (Tex.2008); *see also Hous. Auth. of City of Dallas v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 88 (1940) ("The law is well established in this state that where the power of eminent domain is granted, a determination

by the condemnor of the necessity for acquiring certain property is conclusive in the absence of fraud."); *Whittington I*, 174 S.W.3d at 898 (explaining that once presumption of necessity arises, landowner can contest fact of necessity only by establishing affirmative defenses such as fraud, bad faith, or arbitrariness). In short, without a showing that the condemnor acted fraudulently, in bad faith, or arbitrarily, the presumption that the taking was necessary is conclusive. *See Anderson v. Teco Pipeline Co.*, 985 S.W.2d 559, 565 (Tex.App.-San Antonio 1998, pet. denied).

▇▇▇ Whether the condemnor acted fraudulently, in bad faith, or arbitrarily is a fact question that may properly be decided by a jury. *See id.* at 566. Because they are affirmative defenses, the landowner has the burden to show that the condemnor acted arbitrarily or fraudulently. *See Malcomson Road Util. Dist.*, 171 S.W.3d at 269 (citing *Ludewig v. Houston Pipeline Co.*, 773 S.W.2d 610, 614 (Tex. App.-Corpus Christi 1989, writ denied) and *Snellen v. Brazoria County*, 224 S.W.2d 305, 310 (Tex.Civ.App.-Galveston 1949, writ ref'd n.r.e.)). The landowner can only establish these affirmative defenses by negating "any reasonable basis" for determining what and how much land to condemn. *See id.; Wagoner v. City of Arlington*, 345 S.W.2d 759, 763 (Tex.Civ. App.-Fort Worth 1961, writ ref'd n.r.e.).

With these principles in mind, we review whether the trial court erred when it denied the Water Authority's motion for JNOV.

## B. Analysis

The Water Authority contends that the evidence is legally insufficient to support the jury's findings that its decision to condemn the Property was fraudulent and arbitrary and capricious. With respect to whether the Water Authority acted arbitrarily and capriciously, the jury was asked, "From a preponderance of the evidence, do you find that the Water Authority's action in determining to take the Property for detention purposes was arbitrary and capricious?" The jury was instructed, " 'Arbitrary and capricious' means willful and unreasoning action, action without consideration and in disregard of the facts and circumstances that existed at the time condemnation was decided upon, or within the foreseeable future." The jury responded affirmatively.

With respect to whether the Water Authority acted fraudulently, the jury was asked, "From a preponderance of the evidence, do you find that the Water Authority's action in determining to take the Property for detention purposes was fraudulent?" The jury was instructed, " 'Fraudulent' means any act, omission or concealment, which involves a breach of legal duty, trust or confidence, justly reposed, and is injurious to another, or by which an undue and unconscientious advantage is taken of another." [3] Again, the jury responded affirmatively.

To support its affirmative defenses, the Country Club offered evidence that can be divided into three general categories: (1) evidence that Dunbar's recommendation to construct storm water detention facilities on the Property lacked a sound basis in

---

**3.** As mentioned, the Water Authority objected to the trial court's definitions with respect to fraud and arbitrariness. The Water Authority also argued that a higher evidentiary burden than preponderance of the evidence applied. The Water Authority also raises these complaints on appeal. We do not address these complaints, however, because, as discussed *infra*, the evidence was legally insufficient to support the jury's findings under the charge as given.

hydrological engineering; (2) evidence that the Water Authority lacked the financial information and funding to construct the detention facilities; and (3) evidence, including statements attributable to the Water Authority and its Board members, showing that the Water Authority desired to prevent redevelopment of the Property. We discuss each category of evidence in turn.

### 1. Dunbar's Recommendation

■ The Water Authority asserted that it based its decision to condemn the Property for the purpose of storm water detention on the recommendation and analysis of professional engineer and hydrologist Dunbar, whom the Water Authority had hired as a consultant regarding flooding issues within its district. Thus, to show that the Water Authority acted arbitrarily or fraudulently when it decided to take the Property, the Country Club was required to show that it did not have a reasonable basis to rely on Dunbar's recommendation. *See Malcomson Road Util. Dist.,* 171 S.W.3d at 269; *Wagoner,* 345 S.W.2d at 763. In other words, if it was reasonable for the Water Authority to follow Dunbar's recommendation regarding taking the Property for storm water detention, then the Water Authority did not act arbitrarily or fraudulently. *See Malcomson Road Util. Dist.,* 171 S.W.3d at 269; *Wagoner,* 345 S.W.2d at 763.

At trial, the evidence showed that land within the Water Authority's boundaries lie within either the 100–year or the 500–year flood plain. Nearly 4,000 of the residences in the district lay within the 500–year flood plain. The evidence further showed that residential flooding has occurred within the district and is a continuing concern.

It is not disputed that the Water Authority has not only the right, but the duty to take action to control flood waters within its boundaries. *See* TEX. WATER CODE ANN. § 51.121; *see also* TEX. WATER CODE ANN. § 49.222. In this regard, the jury in this case was instructed as follows:

> The Water Authority has the right and duty to control flood waters. Since the power to control flood waters exists, it carries with it the usual established and well recognized methods of control. One such method is storage reservoirs or retarding basins for impounding flood waters, controlling the streams and preventing floods.

As mentioned, Dunbar gave an oral report along with a PowerPoint presentation to the Water Authority at the November 10, 2005 board meeting. In his presentation, Dunbar recommended that the Property be used as a storm water detention facility to alleviate flooding in the district. Following Dunbar's presentation, the Board passed the Resolution to obtain the Property to construct storm water detention facilities.

During his presentation to the Board, Dunbar showed maps from the Tropical Storm Allison Recovery Project depicting the extent of the 100 and 500 year flood plains of Horsepen Bayou, an area that lies within the Water Authority's district. Dunbar indicated that 1,727 acres of storage capacity for storm-water runoff could be created by converting the 178–acre golf course into a series of interconnected detention ponds.

The evidence showed that Dunbar presented a general description of the configuration of the proposed detention ponds. He explained to the Board that the Property would be excavated to an average depth of 11 feet, with three-to-one side slopes. Dunbar further explained that 2,047 acres of surface area would drain into the ponds. Using the maps as visual aids, Dunbar showed how the area would

drain into the detention ponds. He told the Board that the golf course pond system would reduce flows into Horsepen Bayou downstream of El Dorado Boulevard by 2,500 cubic feet per second, or 20 percent. This would reduce 100–year flood levels in Horsepen Bayou by approximately 1.5 feet and in Armand Bayou, into which Horsepen Bayou flows, by approximately 2,300 cubic feet per second, or by 10 percent.

At trial, the Country Club offered the testimony of Andrew Yung, its engineering hydrologist expert. Yung had experience in both the public and private sector working in the field of hydrology, including public sector experience planning regional detention basins.

Yung reviewed numerous documents, including Dunbar's reports and his Power-Point presentation, to analyze whether the Water Authority's determination to condemn the Property for storm-water detention was supported by sound engineering analysis. For a number of reasons, Yung concluded it was not. In support of his conclusion, Yung noted that the properties in the vicinity of the golf course are outside the 100–year floodplain. He pointed out that Dunbar's July 2005 report demonstrated that the neighborhoods around the Property experience flooding due to inadequate storm-sewer systems, not lack of detention capacity. According to Yung, Dunbar provided no analysis quantifying the benefits of a regional detention facility to the areas surrounding the Property.

Yung also stated that Dunbar's reports were inadequate because they were conceptual only. Yung opined that the reports did not contain information justifying the need for the proposed detention facilities or the type of project detail agencies ordinarily would require before initiating the acquisition of property for detention purposes. Yung testified that the Dun-

bar's reports lacked analysis regarding the design of hydraulic structures necessary to divert drainage of 1,649 acres uphill from one of the creeks on the Property and lacked evidence that the county flood control district would authorize such a diversion. Yung further opined that Dunbar's analysis lacked any hydraulic analysis to support his assertions regarding the impact that the proposed detention facilities would have on the 100–year floodplain and flood levels along Horsepen Bayou.

On appeal, the Country Club also points out that Dunbar's own trial testimony shows that his PowerPoint presentation and September 2006, report did not address (i) the necessary drainage interconnections, (ii) the drainage design to allow water to drain uphill, (iii) the drainage conduit to connect detention facilities across El Dorado Boulevard, and (iv) the drainage outlet structures to connect the detention to the Harris County Flood Control District's ditches. Dunbar also testified that he did not estimate the cost of the detention facility for the Water Authority, and he did not prepare specific designs for the detention facility.

Yung also testified that the detention facility would benefit only 15 to 20 homes along Horsepen Bayou. He believed that the better, more cost-efficient option would be to buy out these homes. For this reason, Yung characterized the Water Authority's decision to construct the detention facility on the Property as "excessive."

In contrast, Dunbar, Branch, and another hydrology expert, Dr. Philip Bedient, a professor at Rice University, hired by the Water Authority, opined that the "conceptual plan" presented by Dunbar to the Board was sufficient to support the decision by the Water Authority to obtain the Property for construction of a detention facility. To address Yung's criticism that Dunbar had not done a hydraulic study of

Horsepen Bayou to support his recommendation, Dr. Bedient testified that the type of study Yung claimed was needed would cost the Water Authority several hundred thousand dollars and was unnecessary to support the Water Authority's decision.

■ A difference in opinion between the Country Club's hydrology expert and the Water Authority's experts regarding what constitutes a sufficient basis in engineering to support the Board's Resolution to take the property for detention purposes does not support a finding that the Water Authority acted in a arbitrary or fraudulent manner. When "there is room for two opinions, an action cannot be deemed arbitrary when it is exercised honestly and upon due consideration, regardless of how strongly one believes an erroneous conclusion was reached." *Ludewig*, 773 S.W.2d at 614; *see Meaney v. Nueces County Navigation Dist. No. 1*, 222 S.W.2d 402, 405, 408 (Tex.Civ.App.-San Antonio 1949, writ ref'd) (explaining with regard to determining whether condemning authority's action was arbitrary and fraudulent that "mere differences of opinion do not raise fact issues for a jury in cases of this character"); *Wagoner*, 345 S.W.2d at 764 ("Neither may it be stated that in said connection a condemnee has met the requisites of proof sufficient to present a judicial issue where the record shows that there was room for two opinions, at the time the condemning authority determined upon the basis of one of such opinions that the land sought should be condemned.").

The record shows that the Water Authority hired Dunbar as a consultant regarding flooding issues. In July 2005, the Water Authority asked Dunbar to expand the scope of his work beyond the Property and address flooding concerns along Horsepen Bayou. As part of his assignment, Dunbar made recommendations to the Board regarding how to address the flooding problems in the district. Dunbar testified that constructing the detention facility on the Property was his idea. He believed that it was the best solution to address the flooding problems. On November 10, 2005, Dunbar made a presentation to the Board at which he explained the benefits of building the detention facility on the Property. After listening to the presentation, the Board voted to adopt the Resolution authorizing the taking of the Property for storm water detention. The Country Club's evidence questioning the soundness of the underlying engineering analysis does not show that the Water Authority's reliance on the Dunbar's recommendation was not rational or legitimate.

■ No evidence was presented that the detention facilities will not benefit the constituents of the Water Authority's district. Rather, the Country Club, through Yung, asserts that the taking of the property is "excessive" in comparison to the benefit reaped. Contrary to the Country Club's position, a showing that alternate plans are feasible or better does not make the condemnation determination fraudulent or arbitrary or capricious. *See Zboyan v. Far Hills Util. Dist.*, 221 S.W.3d 924, 930 (Tex.App.-Beaumont 2007, no pet.); *Ludewig*, 773 S.W.2d at 614; *Wagoner*, 345 S.W.2d at 763. Courts afford broad discretion to those in whom the power of eminent domain is vested. *See Pizzitola v. Houston Indep. Sch. Dist.*, No. 13-05-249-CV, 2006 WL 1360838, at *4 (Tex.App.-Corpus Christi May 18, 2006, no pet.) (mem.op.) (citing *Webb v. Dameron*, 219 S.W.2d 581, 584 (Tex.Civ.App.-Amarillo 1949, writ ref'd n.r.e.)). When property is taken for a legitimate reason, the taking is not arbitrary even if the possibility of utilizing the purpose for which it is taken is "remote." *See Ludewig*, 773 S.W.2d at 614–15 (upholding trial court's decision to disregard jury's arbitrariness finding

against condemnor when property taken for legitimate purposes of maintenance, even though condemnor admitted that needing to conduct maintenance likely a remote possibility).

There is also no evidence that the Water Authority has ever admitted that the Property is not needed as a detention facility or that it has no intention of using the Property for storm water detention. In this regard, this case is distinguishable from others in which jury findings of arbitrariness or fraud have been upheld. *See, e.g., City of Austin v. Whittington* (*"Whittington II"*), No. 03–07–00729–CV, 2010 WL 567153, at *3 (Tex.App.-Austin Feb. 18, 2010, pet. filed) (mem.op.) (affirming jury findings of arbitrariness and fraud when condemning authority's representative had admitted in a letter that taking of property was not necessary for purpose for which it was taken); *City of Houston v. Hamons*, 496 S.W.2d 662, 664–65 (Tex.Civ.App.-Houston [14th Dist.] 1973, writ ref'd n.r.e.) (holding evidence sufficient to support jury's arbitrariness finding when city officials admitted that city had no intent to use condemned property for expressly stated purpose for which it was taken).

### 2. Funding and Feasibility of the Detention Facilities

To support its affirmative defenses of fraud and arbitrariness, the Country Club relied on evidence showing that the Water Authority had not been informed of the potential construction and engineering costs associated with building the proposed detention facilities before passing the Resolution to acquire the Property. The Country Club also pointed out that the Water Authority did not have the $19 million estimated by Yung to complete the detention project. The Country Club further cited evidence that the Water Authority had not obtained approval or permits from the county flood control district or

the City of Houston regarding the drainage plan or the use of existing structures integral to the detention project.

 Again, we must view evidence in its proper context with other evidence; evidence cannot be considered in isolated bits and pieces divorced from its surroundings; it must be viewed in its proper context with other evidence. *AutoZone*, 272 S.W.3d at 592 (citing *City of Keller*, 168 S.W.3d at 827). Here, Branch testified that the Water Authority issues bonds to fund its "large capital projects." Branch testified that the Water Authority has had no difficulty in funding other improvement projects costing even more than the proposed detention facility. He testified that the Water Authority has the ability to fund the detention project at issue. The Country Club offered no evidence to prove otherwise. Simply showing that the Water Authority was unaware of the cost of the detention project at the time of the Resolution's passage is not evidence of fraud or arbitrariness. *See Pizzitola*, 2006 WL 1360838, at *4 (holding that landowner's showing that condemning authority failed to allocate specific funds for acquisition of property before deciding to take property was not evidence that decision to take property was arbitrary and capricious).

 Evidence was presented that it is standard practice for Harris County and federal entities charged with flood control to receive a cost estimate before approving the acquisition of the land needed for the detention facility. However, this evidence, suggesting an industry standard, does not address the circumstances of this case specifically enough to constitute evidence that the Water Authority acted fraudulently or arbitrarily. *See Circle X Land & Cattle Co., Ltd. v. Mumford Indep. Sch. Dist.*, 325 S.W.3d 859, 868 (Tex.App.-Houston [14th Dist.] 2010, no pet. h.) (holding, in summary-judgment context, that landown-

er's evidence of industry standard, which failed to specifically discuss circumstances of case at hand, did not raise material raise fact issue concerning whether condemning authority had acted in arbitrary and capricious manner).

■■■■ In addition, courts have explained that it is not arbitrary or capricious to base a condemnation on a reasoned prediction of future need or demand. *See id.; Pizzitola*, 2006 WL 1360838, at *5. It follows that evidence that the Water Authority had not secured the necessary permits or permission from other governmental agencies to construct the detention facility is not evidence that its condemnation decision was fraudulent or arbitrary and capricious.

### 3. Evidence of the Water Authority's Desire to Stop Redevelopment

■■■ At trial, the Country Club argued that the Water Authority's true motivation for condemning the Property was to prevent its redevelopment and to preserve the Property as a green space. In support of this theory, the Country Club places particular significance on a February 2007 engagement letter from an attorney at Wilson, Cribbs & Goren, the firm representing the Civic League and the Water Authority in the Exxon Litigation. As mentioned, the Water Authority and the Civic League intervened in the suit to prevent the Country Club from succeeding in the removal of the deed restrictions on the Property, which prevented its redevelopment.

In the letter, the attorney discloses that his firm is representing a civic group in another lawsuit against the principal of the Country Club. The attorney then states, "In both situations, our client's goal is to stop redevelopment and retain the areas as common use/greenspace." The engagement letter was signed by the Water Au-

thority's president. The Country Club asserts that this letter reveals the Water Authority's true reason for acquiring the Property: to prevent redevelopment. The Country Club also pointed (1) to the Water Authority's support of the legislation that makes it more difficult to redevelop abandoned golf courses, (2) to various statements by Branch indicating that he wanted the Property not to be developed, (3) to Savely's and Branch's individual involvement with the Green Space Committee, (4) to Savely's proposed resolution for the Water Authority to support the goals of the Green Space Committee, and (5) to other evidence indicating that the Water Authority and its Board members desired to prevent the Property from being redeveloped.

On appeal, the Water Authority does not dispute that it desires to prevent the Property's redevelopment. We agree with the Water Authority that this does not equate to a finding that it acted fraudulently or arbitrarily in deciding to acquire the Property for storm water detention purposes. A desire to stop redevelopment and a desire to construct a storm water detention facility on the Property are not goals that are inimical to one another. To the contrary, evidence at trial showed that both objectives are relevant to flood control, an issue statutorily delegated to the Water Authority.

The prevention of redevelopment is inherent in the construction of the detention facility, but does not rise to an inference that such prevention was the true purpose of the acquisition of the property. *See Boucher v. Tex. Turnpike Auth.*, 317 S.W.2d 594, 600 (Tex.Civ.App.-Texarkana 1958, no writ) (noting that purpose that landowner claimed was "true" purpose of taking was inherent in stated purpose for the acquisition of the property). Rather, it is the purpose for which condemnation was sought that is to be examined in resolving

the question of whether the Water Authority acted fraudulently and arbitrarily. *Wagoner*, 345 S.W.2d at 763. If the purpose is a legitimate one, evidence that the Water Authority benefited in some other way is not evidence that can establish fraud or arbitrariness. *See id.*

As discussed, the evidence is legally insufficient to show that the Water Authority was unjustified in relying on Dunbar's recommendation to construct a storm water detention facility on the Property to address flood control issues within the district. The evidence failed to negate Dunbar's recommendation as a reasonable basis for the Water Authority's acquisition of the Property. *See id.* Evidence that the decision to acquire the Property also benefitted the Water Authority by realizing its desire to stop redevelopment does not support the jury's finding that the Water Authority acted fraudulently and arbitrarily in making its decision. *See id.; see also Circle X Land & Cattle Co., Ltd.*, 325 S.W.3d at 867 (concluding that changing use of the condemned land after condemnation decision made does not evidence that condemnor acted arbitrarily).

We conclude that the evidence admitted at trial is legally insufficient to support the jury's findings that the Water Authority acted fraudulently or acted arbitrarily and capriciously in determining to acquire the Property for storm water detention purposes. We hold that the trial court erred when it denied the Water Authority's motion for judgment notwithstanding the verdict. Had it properly granted the motion, the trial court would have rendered judgment permitting the Water Authority to condemn and acquire the Property on payment of $5.1 million, representing the fair market value of the Property, as found by the jury. We sustain the Water Authority's first issue in this regard.[4]

### Conclusion

We reverse the trial court's judgment and remand for further proceedings to permit the trial court to render the proper condemnation judgment in accordance with this opinion.

---

4. Because this issue is dispositive, we do not reach the remainder of the Water Authority's issues presented on appeal.