**Opinion issued December 4, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

NO. 01-18-00365-CV
NO. 01-18-00406-CV
NO. 01-18-00407-CV

———————————

**SAN JACINTO RIVER AUTHORITY, Appellant**

**V.**

**MICHAEL A. BURNEY, GINGER R. BURNEY, CHARLES A. CASEY, MAUREEN S. CASEY, JOHN M. DANIEL, CAROLYN F. DANIEL, ROBERT C. MILES, SHERRY K. MILES, JACK L. NOWLIN, LINDA S. NOWLIN, BARRY L. SHEPHERD, BECKY A. SHEPHERD, CHARLES H.F. WHERRY, DIANE S. WHERRY, RODNEY M. WOLF, AND NANCY L. WOLF, Appellees**

\* \* \*

**SAN JACINTO RIVER AUTHORITY, Appellant**

**V.**

**CHARLES J. ARGENTO, KATHARINE ARGENTO, KRISTOFER D. BUCHAN, MELISSA BUCHAN, BRANDON BURGESS, DIANE BURGESS, JEFF ENSLEY, ANNE ENSLEY, JOHN FAULKINBERRY, LAURIE D. FAULKINBERRY, JOHN R. FREEMAN, BARBARA FREEMAN, KURT V. HUSEMAN, DEBBIE L. HUSEMAN, WILLIAM E. LANGE, JENNIFER**

**WOOD LANGE, DAVID L. MILLER, SALLY T. MILLER, WILLIAM J. NAPIER, JR., CHRISTINE D. NAPIER, JAMES L. REVEL, LOUISE W. REVEL, BERNARD F. RYAN, CECILIA M. RYAN, DANA M. STEGALL, DANNY C. STEGALL, TODD R. SUMNER, AND KIMBERLY A. SUMNER, Appellees**

\* \* \*

**SAN JACINTO RIVER AUTHORITY, Appellant**

**V.**

**VICENTE MEDINA, ASHLEY MEDINA, AND ARIS ANTONIOU, Appellees**

---

**On Appeal from the 151st and 157th District Courts**
**Harris County, Texas**
**Trial Court Case Nos. 2018-10744, 2018-10787, and 2018-10478**

---

**O P I N I O N**

During Hurricane Harvey, the San Jacinto River Authority released water from Lake Conroe into the San Jacinto River. Owners of homes that flooded in Kingwood, Texas have sued the River Authority in the district courts of Harris County, seeking compensation for their inverse-condemnation and statutory takings claims. The River Authority filed Rule 91a motions to dismiss these three substantively identical lawsuits, which were denied. The River Authority now seeks interlocutory review.

Because the Legislature has given the Harris County civil courts at law exclusive jurisdiction over inverse-condemnation claims, the district courts lack

subject-matter jurisdiction over those claims. The district courts do, however, have subject-matter jurisdiction over the homeowners' statutory takings claims, and we affirm the denials of the motions to dismiss on grounds of governmental immunity, because the homeowners have pleaded sufficient facts to demonstrate that the takings claims have a basis in law and fact.

**Background**

The San Jacinto River Authority is a water conservation and reclamation district created in 1937.[1] Its functions include providing for the control, storage, preservation, distribution, conservation, and reclamation of water, including floodwater.[2] The River Authority also may control, abate, or change any shortage or harmful excess of water.[3]

In 1973, the River Authority constructed a dam across the West Fork of the San Jacinto River, resulting in the formation of a reservoir named Lake Conroe. The River Authority now operates the dam and other infrastructure at Lake Conroe.

---

[1]    Act of May 12, 1937, 45th Leg., R.S., ch. 426, § 1, 1937 Tex. Gen. Laws 861, 861 (creating the San Jacinto River Conservation and Reclamation District); *see also* Act of May 14, 1951, 52nd Leg., R.S., ch. 366, § 1, 1951 Tex. Gen. Laws 617, 617 (renaming the District the "San Jacinto River Authority").

[2]    TEX. CONST. art. XVI, § 59; TEX. WATER CODE § 51.121(b)(l), (3).

[3]    TEX. WATER CODE § 51.121(b)(5).

The homeowners in these interlocutory appeals allege that during Hurricane Harvey in late August 2017, the River Authority released rising water from Lake Conroe into the West Fork of the San Jacinto River, causing or exacerbating the downstream flooding of their homes in Kingwood. They allege three causes of action against the River Authority: inverse condemnation of their real and personal property; inverse condemnation by an "inundation, flood, flowage or drainage easement" over their property; and a statutory takings claim under Government Code section 2007.021. The only difference among the claims of the various homeowners at this stage is the varying physical location of their real property, and that factor is not a material difference for purposes of any of the legal issues presented by these interlocutory appeals. Many similar suits have been filed and currently are pending in various Harris County trial courts, including the county civil courts at law.

In these particular cases, the River Authority filed Rule 91a motions to dismiss the lawsuits as lacking any basis in law or fact. As a political subdivision of the state,[4] it asserted governmental immunity as a ground for dismissal. The trial

---

[4]   Act of May 12, 1937, 45th Leg., R.S., ch. 426, §§ 2–3, 1937 Tex. Gen. Laws 861, 861–62.

courts denied the motions. On appeal,[5] the River Authority raises two issues. In the first issue, raised for the first time on appeal, it contends that the Harris County district courts lack subject-matter jurisdiction over the inverse-condemnation claims because exclusive jurisdiction belongs to the Harris County civil courts at law. In the second issue, the River Authority asserts that the homeowners failed to allege sufficient facts to establish the elements of a takings claim and thereby demonstrate a waiver of immunity.

## Analysis

### I. Subject-matter jurisdiction over Harris County inverse-condemnation claims

Subject-matter jurisdiction is essential to a court's authority to decide a case, cannot be waived, and may be raised for the first time on appeal.[6]

#### A. Inverse condemnation

The River Authority asserts for the first time on appeal that the Harris County district courts lack jurisdiction over the inverse-condemnation claims because the Harris County county civil courts at law have exclusive subject-matter

---

[5] TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). Interlocutory appeals with substantively identical issues are currently pending in the Fourteenth Court of Appeals.

[6] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–45 (Tex. 1993).

5

jurisdiction over such claims pursuant to Government Code subsection 25.1032(c). That statute provides:

> A county civil court at law has exclusive jurisdiction in Harris County of eminent domain proceedings, both statutory and inverse, if the amount in controversy in a statutory proceeding does not exceed the amount provided by Section 25.0003(c) in civil cases. Notwithstanding Section 21.013, Property Code, a party initiating a condemnation proceeding in Harris County may file a petition with the district clerk when the amount in controversy exceeds the amount provided by Section 25.0003(c). The amount in controversy is the amount of the bona fide offer made by the entity with eminent domain authority to acquire the property from the property owner voluntarily.

Inverse-condemnation claims and statutory condemnation claims are distinct categories of eminent-domain proceedings.[7] A statutory eminent-domain or condemnation proceeding under the Property Code involves the government's acquisition of real property.[8] An inverse-condemnation action is a constitutional claim in which the property owner asserts that an entity with eminent-domain power intentionally performed acts that resulted in a "taking" of the property for public use, without formally condemning the property.[9] A claimant seeking recovery for inverse condemnation must prove that the governmental entity

---

[7] *State v. Momin Props., Inc.*, 409 S.W.3d 1, 10 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

[8] *See* TEX. PROP. CODE. §§ 21.011–.025; *Momin Props.*, 409 S.W.3d at 10.

[9] *See, e.g.*, *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004).

6

intentionally took or damaged property for public use, or that the governmental entity was substantially certain that would be the result.[10] Unlike inverse-condemnation claims,[11] a statutory condemnation proceeding requires an entity with eminent-domain authority to make a bona fide offer to acquire the property from the owner voluntarily.[12]

Generally, Texas district courts and county courts at law have concurrent jurisdiction in eminent-domain cases.[13] Harris County is an exception. Before September 1, 2015, county civil courts at law had exclusive jurisdiction of all eminent-domain proceedings in Harris County. The former statute provided: "A county civil court at law has exclusive jurisdiction in Harris County of eminent domain proceedings, both statutory and inverse, regardless of the amount in controversy."[14] For cases filed on or after September 1, 2015, the Legislature

---

[10] *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016).

[11] *See id.* at 799–803 (discussing elements of inverse-condemnation claim).

[12] TEX. PROP. CODE §§ 21.0113, 21.012(b)(6), 21.047(d).

[13] *Id*. § 21.001 ("District courts and county courts at law have concurrent jurisdiction in eminent domain cases.").

[14] Act of May 15, 1989, 71st Leg., R.S., ch. 445, § 1, 1989 Tex. Gen. Laws 1605, 1606 (amended 1991, 2011, 2015) (current version at TEX. GOV'T CODE § 25.1032(c)).

modified the subject-matter jurisdiction of Harris County courts with respect to eminent-domain cases by amending subsection 25.1032(c) as follows:

> A county civil court at law has exclusive jurisdiction in Harris County of eminent domain proceedings, both statutory and inverse, if the amount in controversy in a statutory proceeding does not exceed the amount provided by Section 25.0003(c) in civil cases. Notwithstanding Section 21.013, Property Code, a party initiating a condemnation proceeding in Harris County may file a petition with the district clerk when the amount in controversy exceeds the amount provided by Section 25.0003(c). The amount in controversy is the amount of the bona fide offer made by the entity with eminent domain authority to acquire the property from the property owner voluntarily [regardless of the amount in controversy].[15]

The River Authority contends that this statute gives the Harris County civil courts at law exclusive subject-matter jurisdiction over the inverse-condemnation claims. In response, the homeowners assert that under the 2015 amendment, the Harris County district courts have subject-matter jurisdiction over their inverse-

---

[15] Act of May 19, 2015, 84th Leg., R.S., ch. 462, § 1, 2015 Tex. Gen. Laws 1777, 1777 (codified at TEX. GOV'T CODE § 25.1032(c)); *see id.* §§ 2, 3, (making change in law effective only for eminent-domain proceedings for which petition was filed on or after September 1, 2015). The amount-in-controversy limit in Government Code section 25.0003(c)(1) is $200,000. Property Code section 21.013 governs venue for condemnation proceedings. It establishes that the "venue of a condemnation proceeding is the county in which the owner of the property being condemned resides if the owner resides in a county in which part of the property is located," and otherwise, "the venue of a condemnation proceeding is any county in which at least part of the property is located." TEX. PROP. CODE § 21.013(a). The Property Code further provides: "Except where otherwise provided by law, a party initiating a condemnation proceeding in a county in which there is one or more county courts at law with jurisdiction shall file the petition with any clerk authorized to handle such filings for that court or courts." *Id.* § 21.013(b).

condemnation claims—and that the Harris County civil courts at law do not have exclusive subject-matter jurisdiction—because in this case "there is no statutory proceeding under the Texas Property Code and there is no bona fide offer at all, much less one for less than $200,000.00, both of which are prerequisites for invoking exclusive County Court at Law jurisdiction" under subsection 25.1032(c).[16]

We disagree with the homeowners' interpretation. Before the 2015 amendment, Harris County civil courts at law had exclusive jurisdiction over all eminent-domain proceedings, both statutory and inverse. The 2015 amendment altered the exclusivity of the jurisdiction of the county civil courts at law under the prior law by carving out an exception that applies "if the amount in controversy in a statutory proceeding does not exceed the amount provided by Section 25.0003(c)

---

[16] In supplemental briefing filed at our request, the homeowners also rely on legislative history to inform the interpretation of the statute, in the form of various bill analyses. *See* 2015 Texas House Bill No. 2536, Committee Report (April 20, 2015); Senate Research Center Bill Analysis, H.B. 2536; H.B. 2536, House Research Organization Bill Analysis (Apr. 29, 2015). We confine our analysis to the text adopted by the Legislature. *See Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 887–89 (Tex. App.— Houston [1st Dist.] 2015, no pet.). The homeowners also rely on Property Code section 21.001, which provides generally for district courts and county courts at law to share concurrent jurisdiction in eminent-domain cases, but this court has held previously that subsection 25.1032(c)'s specific grant of exclusive jurisdiction in Harris County proceedings controls over the general provisions of section 21.001. *See, e.g.*, *City of Houston v. Boyle*, 148 S.W.3d 171, 177–79 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *see also Taub v. Aquila Sw. Pipeline Corp.*, 93 S.W.3d 451, 456–59 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

in civil cases." By its terms, the exception to the exclusivity of the jurisdiction of the county civil courts at law embraces only one category of eminent-domain proceedings: statutory condemnation proceedings in which the condemnor's bona fide offer exceeds $200,000. In this category, the Harris County district courts and county civil courts at law have concurrent jurisdiction. In all other eminent-domain proceedings—inverse-condemnation proceedings and statutory condemnation proceedings in which the condemnor's bona fide offer does not exceed $200,000— the county civil courts at law maintain exclusive jurisdiction.

The statute as amended cannot be plausibly read, as the homeowners suggest, to make all of the "exclusive jurisdiction" bestowed on the county civil courts at law conditioned on the existence of a bona fide offer made by the condemnor in an amount under $200,000. That would negate the effect of the exclusive jurisdiction including proceedings "both statutory and inverse" because the language relating to "the amount in controversy in a statutory proceeding" will never apply to an inverse (i.e. non-statutory) proceeding. Instead, the only interpretation that gives effect to all parts of the statute limits the application of the "if" clause—whether characterized as a condition of or an exception to the exclusive jurisdiction vested in Harris County civil courts at law over "eminent domain proceedings, both statutory and inverse"—to statutory proceedings, as the plain text requires.

10

Earlier laws can inform the interpretation that otherwise would be given to later-enacted laws,[17] and the 2015 amendment should be construed "to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law."[18] The original statute vested exclusive jurisdiction over inverse-condemnation claims filed in Harris County in the county civil courts at law, and the 2015 amendment did not unequivocally repeal that provision.[19] We conclude that the only fair reading of subsection 25.1032(c) as amended is that the exclusive jurisdiction of the Harris County civil courts at law in eminent domain proceedings, which applies in circumstances "both statutory and inverse," has been modified to carve out an exception for statutory condemnation proceedings in which the condemnor has made a bona fide offer exceeding $200,000. Those excepted claims may be filed in a Harris County district court.

---

[17]  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 330–31 (2012) (explaining presumption against implied repeal).

[18]  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100, 111 S. Ct. 1138, 1148 (1991) (citing 2 J. SUTHERLAND, STATUTORY CONSTRUCTION § 5201 (3d F. Horack ed. 1943)).

[19]  *See Cole v. State ex rel. Cobolini*, 170 S.W. 1036, 1037 (Tex. 1914) ("Laws are enacted with a view to their permanence, and it is to be supposed that a purpose on the part of the lawmaking body to abrogate them will be given unequivocal expression.").

This interpretation is consistent with the 2015 amendment's deletion of the words "regardless of the amount in controversy." The Harris County civil courts at law thus maintain their exclusive jurisdiction over all inverse-condemnation claims and over statutory condemnation proceedings in which the condemnor's bona fide offer is no more than $200,000, and the Harris County civil courts at law and the Harris County district courts have concurrent jurisdiction over statutory condemnation proceedings in which the condemnor's bona fide offer is more than $200,000.[20]

## B. Statutory takings claims

The homeowners' remaining claims are statutory takings claims under Government Code Chapter 2007, the Private Real Property Rights Preservation Act.[21] In *City of Houston v. Guthrie*, this court addressed a district court's subject-matter jurisdiction in a Harris County case that involved inverse-condemnation

---

[20]  *Accord Doan v. TransCanada Keystone Pipeline, LP*, 542 S.W.3d 794, 806 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Walker v. State*, No. 14-17-00710-CV, 2018 WL 3151254, at *3 n.5 (Tex. App.—Houston [14th Dist.] June 28, 2018, no pet.) (mem. op.).

[21]  The statute is occasionally referenced as the "PRPRPA." We avoid use of that inelegant acronym in this opinion in favor of references to "Chapter 2007," but we note it here for the benefit of legal researchers who may use it as a search term.

claims and a statutory takings claim under Chapter 2007.[22] An action brought pursuant to Chapter 2007 to determine whether the governmental action of a political subdivision resulted in a taking is required by the statute to be filed in a district court in the county in which the affected property is located.[23] This court held in *Guthrie* that a Harris County district court did not have subject-matter jurisdiction over the inverse-condemnation claims because the county courts at law of Harris County had exclusive jurisdiction under subsection 25.1032(c), and despite the resulting piecemeal litigation, the Chapter 2007 claim only could be brought in the district court.[24]

Although subsection 25.1032(c) was amended in 2015 after *Guthrie* was decided, we hold that the statute still specifies exclusive jurisdiction over inverse-condemnation claims in the Harris County civil county courts of law. Therefore the result in this case is similar to the outcome in *Guthrie*: the Harris County district courts lack subject-matter jurisdiction over the homeowners' inverse-condemnation claims, but it does have subject-matter jurisdiction over the homeowners' Chapter 2007 claims.

---

[22]    332 S.W.3d 578, 592–93 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

[23]    TEX. GOV'T CODE § 2007.021(a).

[24]    *Guthrie*, 332 S.W.3d at 587, 592–93.

*    *    *

The Harris County district courts in these cases lack subject-matter jurisdiction over the homeowners' inverse-condemnation claims, and we sustain the River Authority's first issue in part. We therefore vacate the district courts' orders denying the motions to dismiss as to the homeowners' inverse-condemnation claims, and we dismiss those claims without prejudice to their refiling in the Harris County civil courts at law.[25]

## II.    Governmental immunity

Governmental immunity consists of immunity from liability and immunity from suit,[26] and when applicable it deprives the trial court of subject-matter jurisdiction over claims against the state or one of its political subdivisions, absent waiver of immunity by the state.[27] In its Rule 91a motions to dismiss, the River Authority contended that the homeowners failed to plead sufficient facts to establish a takings claim and thus demonstrate a waiver of governmental immunity.

---

[25]    *Doan*, 542 S.W.3d at 806; *Kerr v. Harris Cty.*, 177 S.W.3d 290, 295 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see* TEX. R. APP. P. 43.2(e).

[26]    *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006).

[27]    *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224–25 (Tex. 2004).

14

The River Authority attached evidence to its motions to dismiss, and it asked the trial courts to take judicial notice of "public record data" as adjudicative facts.[28] The homeowners objected and moved to strike the River Authority's evidence. The trial courts sustained the objections and struck the evidence. On appeal, the River Authority does not specifically complain that the trial courts excluded evidence. Instead, it urges us to take judicial notice of the alleged adjudicative facts in our review of its motion to dismiss.

**A. Standards applicable to Rule 91a motions to dismiss**

We review de novo the merits of a Rule 91a motion.[29] Rule 91a's dismissal grounds have been analogized to a plea to the jurisdiction, which requires a court to determine whether a plaintiff's pleading alleges facts that demonstrate a waiver of governmental immunity and thus the existence of subject-matter jurisdiction.[30] Whether a plaintiff has alleged facts that affirmatively demonstrate the existence of subject-matter jurisdiction is a question of law that we review de novo.[31] To

---

[28]   TEX. R. EVID. 201.

[29]   *See City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016) (per curiam); *Stallworth v. Ayers*, 510 S.W.3d 187, 190 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

[30]   *Sanchez*, 494 S.W.3d at 724–25 (applying Rule 91a to subject-matter jurisdictional challenge based on pleaded facts, citing *Wooley v. Schaffer*, 447 S.W.3d 71, 75 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

[31]   *Id.* at 725.

determine whether dismissal under Rule 91a is required in these cases, we consider "whether the pleadings, liberally construed, allege sufficient facts to invoke a waiver of governmental immunity."[32] We review the jurisdictional challenge "without delving into the merits of the case."[33]

The River Authority contends that "Texas courts have not expressly ruled on whether a court may consider facts of which they may or must take judicial notice in connection with a motion to dismiss under Rule 91a." It further suggests that Texas courts "have analogized a Rule 91a motion to dismiss to a Federal Rule 12(b)(6) motion to dismiss and have noted the applicability of case law interpreting Rule 12(b)(6) as instructive in addressing a motion under Rule 91a." From this premise, the River Authority argues that we "must" take judicial notice of extensive "adjudicative facts" concerning the circumstances of Hurricane Harvey. The River Authority's arguments rely heavily on this proposed evidence.

---

[32] *Id.* (citing *Miranda*, 133 S.W.3d at 226); *see HS Tejas, Ltd. v. City of Houston*, 462 S.W.3d 552, 556 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

[33] *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) ("the proper function of a dilatory plea does not authorize an inquiry so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction").

Quite to the contrary of the River Authority's suggestion, our court has noted the obvious: Rule 91a.6 expressly prohibits the consideration of evidence.[34] Under the rule, a "court may not consider evidence in ruling on the motion."[35] Furthermore, a court "must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59."[36] The River Authority's argument for judicial notice of adjudicative facts in connection with a Rule 91a motion to dismiss is that some Texas courts in entirely different circumstances have found cases applying Rule 12(b)(6) instructive,[37] and federal courts can take judicial notice of matters of public record in reviewing a Rule 12(b)(6) motion to dismiss.[38] But considering the rule's plain and contrary text, we are unpersuaded. The text of Rule 91a expressly prohibits a court's consideration of evidence, while the text of Rule 12(b)(6) is silent on that subject.

Because Rule 91a expressly prohibits a court's consideration of evidence, and it expressly requires that the motion to dismiss be decided based solely on the

---

[34] *Dailey v. Thorpe*, 445 S.W.3d 785, 790 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also Wooley*, 447 S.W.3d at 81 (Frost, C.J., concurring) (criticizing attachment of evidence to Rule 91a motion to dismiss).

[35] TEX. R. CIV. P. 91a.6.

[36] *Id.*

[37] *E.g.*, *Wooley*, 447 S.W.3d at 75–76.

[38] *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

17

pleadings, we decline to take judicial notice of the River Authority's proffered evidence.

## B. Scope of Chapter 2007 takings claims

Chapter 2007 provides that a private real-property owner may bring suit to determine whether the governmental action of a political subdivision "results in a taking."[39] Relying entirely on legislative history,[40] the River Authority argues that Chapter 2007 "simply does not apply" to the homeowners' "claims of inverse condemnation by alleged flooding," and it only permits challenges against government entities "for enacting regulations that allegedly infringe on an owner's property rights."

---

[39]    TEX. GOV'T CODE § 2007.021(a).

[40]    The River Authority's supplemental brief quotes a Senate bill analysis to argue that the Legislature's "stated purpose" for Chapter 2007 was "to address the fact that '[i]n Texas, governmental entities are not required to evaluate the effect of their administrative and regulatory actions on constitutionally-protected property rights.'" Br. at 4 (quoting Senate Research Center, Bill Analysis, Tex. S.B. 14, 74th Leg., R.S. (1995)). The legislative history quoted in the brief is not only not part of the statute approved by the Legislature, it is not even part of the "purpose" identified in the quoted bill analysis, which instead simply reads: "As proposed, C.S.S.B. 14 sets forth regulations regarding state governmental or political subdivision actions regarding private real property." Senate Research Center, Bill Analysis, Tex. S.B. 14, 74th Leg., R.S. (1995). The River Authority also argues that a statutory basis for an alleged inverse condemnation claim is "notably absent" from Chapter 2007's legislative history. As explained above, the plain text of the statute amply overcomes inferences the River Authority would have us draw from the legislative history's silence.

18

This argument does not withstand scrutiny under the actual text of the statute, which defines a "taking" more broadly as specified "governmental actions," including:

> (A)   a governmental action that affects private real property, in whole or in part or temporarily or permanently, in a manner that requires the governmental entity to compensate the private real property owner as provided by the Fifth and Fourteenth Amendments to the United States Constitution or Section 17 or 19, Article I, Texas Constitution; or
>
> (B)   a governmental action that:
>
> (i)   affects an owner's private real property that is the subject of the governmental action, in whole or in part or temporarily or permanently, in a manner that restricts or limits the owner's right to the property that would otherwise exist in the absence of the governmental action; and
>
> (ii)   is the producing cause of a reduction of at least 25 percent in the market value of the affected private real property, determined by comparing the market value of the property as if the governmental action is not in effect and the market value of the property determined as if the governmental action is in effect.[41]

Among other things, the statute expressly applies to a governmental action "that imposes a physical invasion . . . of private real property."[42] We therefore reject the River Authority's contention that Chapter 2007 applies only to regulatory takings

---

[41]   TEX. GOV'T CODE § 2007.002(5).

[42]   *Id.* § 2007.003(a)(2).

and does not apply to physical takings, such as flooding as alleged by the homeowners.

Chapter 2007 waives governmental immunity to suit and liability "to the extent of liability created" by the statute.[43] It therefore waives immunity for "governmental actions" alleged to have caused a constitutional taking or a reduction of at least 25 percent in the market value of the affected property,[44] both of which the homeowners have alleged as the basis of their Chapter 2007 claim.

## C. Chapter 2007 constitutional taking (§ 2007.002(5)(A))

"No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person."[45] For a constitutional takings claim, a claimant must plead that the governmental entity intentionally performed affirmative acts that resulted in a physical taking of specific property for public use.[46]

In their effort to state takings claims under Chapter 2007, the homeowners alleged that the River Authority intentionally, knowingly, affirmatively, and

---

[43] *Id.* § 2007.004.

[44] *See Guthrie*, 332 S.W.3d at 588–89; *see also Gilliam v. Santa Fe ISD*, No. 02-14-00186-CV, 2016 WL 828055, at *6 (Tex. App.—Houston [1st Dist.] Mar. 3, 2016, no pet.) (mem. op.).

[45] TEX. CONST. art. I, § 17(a).

[46] *See Kerr*, 499 S.W.3d at 799.

consciously decided to release water from Lake Conroe. They contend that their property was inundated, flooded, taken, inversely condemned, and physically invaded by floodwaters for the greater public good. The homeowners alleged that these actions, in addition to being constitutional takings, were "government actions" by the River Authority that affected their private real property "in whole or in part and temporarily and permanently," such that compensation is required under subsection 2007.002(5)(A). They further pleaded that, as a result of the government actions and the flooding, they were unable to return such that they were deprived of the use, occupancy, and enjoyment of their homes. The government actions are alleged to have damaged these homes, requiring repairs costing hundreds of thousands of dollars and causing permanently diminished property values.

The River Authority argued in its motions to dismiss that the homeowners have not pleaded a taking sufficiently under the Texas Constitution so as to demonstrate a waiver of governmental immunity. It contends that the homeowners have not sufficiently pleaded that their properties were intentionally flooded for a public purpose. And the River Authority argues that the flooding was not a taking because there was a confluence of water and because the peak release of lake water was less than its peak inflow.

## 1. Specificity of intent

A claimant pleads the necessary intent for a constitutional takings claim by alleging that the governmental entity knew that a specific act would cause the resulting identifiable property damage or knew that the specific property damage was substantially certain to result from the government action.[47]

The River Authority argues that to plead viable takings claims, the homeowners were required, but failed, to allege that it knew its actions would result in the flooding of each of the homeowners' specific properties. The River Authority relies on two decisions of the Supreme Court of Texas, *City of Dallas v. Jennings*[48] and *Harris County Flood Control District v. Kerr*.[49]

The *Jennings* case involved a government action to dislodge a clogged sewer main, which caused another sewage backup and a raw sewage flood in the claimants' home.[50] The Court concluded that there was "no evidence that the City knew, when it unclogged the sewer line, that any flooding damage would occur."[51]

---

[47] *Id.*; *Gragg*, 151 S.W.3d at 555; *City of Dallas v. Jennings*, 142 S.W.3d 310, 313–14 (Tex. 2004).

[48] 142 S.W.3d 310 (Tex. 2004).

[49] 499 S.W.3d 793 (Tex. 2016).

[50] *Jennings*, 142 S.W.3d at 312.

[51] *Id.* at 315.

22

That is a material distinction from this flooding case and the River Authority's argument that it had to be aware not only that flooding would result from its action, but also that specific, identifiable properties would be impacted. Thus *Jennings* provides no direct support to the River Authority's argument, other than inferences that might be drawn from the opinion's articulation of general principles that "if the government knows that *specific damage* is substantially certain to result from its conduct, then takings liability may arise even when the government did not particularly desire the property to be damaged," and a taking may occur "when a governmental entity is aware that its action will necessarily cause physical damage *to certain private property*, and yet determines that the benefit to the public outweighs the harm caused to that property."[52]

*Kerr* involved flooding, but it is also factually distinguishable. The damage alleged in that case did not result from an intentional release of water, but instead from the approval of private development without full implementation of a previously approved flood-control plan.[53] The Court recited the general principle that the takings claimants must prove the government "intentionally took or damaged their property for public use, or was substantially certain that would be

---

[52]     *Id*. at 314 (emphases supplied).

[53]     *Kerr*, 499 S.W.3d at 795.

the result."[54] The outcome in *Kerr* turned, in part, on the Court's observations that no flooding ever was intended by the governmental entity, the only affirmative conduct alleged to have caused flooding was the approval of private development, and the particular properties at issue were not intended to be used as part of a flood-control plan as detention ponds, drainage easements, or the like.[55] The Court did quote *Tarrant Regional Water District v. Gragg*[56] for the general principle that requisite intent for a takings claim is present "when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result."[57]

*Gragg* was a case that bore more factual similarities to this case than *Jennings* or *Kerr*, because it involved flooding resulting from the government's intentional release of water from a reservoir.[58] In that case, a water district built a reservoir to supply water; it was not constructed to control floods.[59] When heavy

---

[54] *Id*. at 799 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005)).

[55] *Id*. at 807.

[56] 151 S.W.3d 546 (Tex. 2004).

[57] *Kerr*, 499 S.W.3d at 799 (quoting *Gragg*, 151 S.W.3d at 555).

[58] *Gragg*, 151 S.W.3d at 550.

[59] *Id*.

rains would prompt the water district to release water, recurring floods resulted that were different from the flooding that occurred before the construction of the reservoir. The Supreme Court held that the record supported the trial court's findings that the resulting damage experienced by the takings claimant "was the inevitable result of the reservoir's construction and of its operation as intended."[60]

None of *Jennings*, *Gragg*, or *Kerr* squarely address the River Authority's contention that for it to have committed a taking, it had to have intended or known that the flooding of particular homeowners' specific properties would be the substantially certain result of its release of water. The United States Supreme Court evidently considers this an open question under federal takings law, since it expressly declined to address the matter in its recent opinion in *Arkansas Game and Fish Commission*.[61] Yet even assuming that this was the homeowners' pleading burden, we conclude that they satisfied it for purposes of surviving a Rule 91a motion to dismiss.

The homeowners specifically alleged that the River Authority "intentionally, knowingly, affirmatively, and consciously flooded" their particular properties,

---

[60] *Id.* at 555.

[61] *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 37–38, 133 S. Ct. 511, 522 (2012) (noting, but declining to address, argument that "damage to downstream property, however foreseeable, is collateral or incidental; it is not aimed at any particular landowner and therefore does not qualify as an occupation compensable under the Takings Clause").

identified by street addresses. The River Authority characterizes these allegations as conclusory "threadbare recitals" of the elements of a takings claim, but we cannot agree. Among other allegations, the homeowners contend that the River Authority was aware that water releases from Lake Conroe in 1994, 1998, 2001, 2002, 2015, and 2016 (and perhaps other years) caused or exacerbated downstream flooding in parts of Kingwood and Humble. The homeowners alleged that the River Authority was aware of information relating to these recurrent and intermittent floods, including the water levels, water volumes, flow or release rates out of Lake Conroe, flow or release rates in the West Fork below the dam and in connected streams and tributaries, and elevations and topography of the downstream land. Moreover, the homeowners also alleged that the River Authority knew which downstream properties had flooded as a result of the prior releases from the lake. Based on this and other information, the homeowners alleged that the River Authority knew, or was substantially certain, that its release of water from Lake Conroe in late August and early September 2017 would harm their particular properties by flooding them or by exacerbating the effects of the flood.

Liberally construing the homeowners' pleadings, as we must, we conclude that they included sufficient facts to allege the River Authority's release of water from Lake Conroe was intended to, or was known to be substantially certain to, result in the flooding or exacerbated flooding of each of the homeowners' specific

26

properties. The same pleadings are also sufficient to overcome the River

Authority's objection that only recurring flooding, as opposed to a single flood

event, can support a takings claim. To the extent this is the law,[62] the pleadings

include sufficient facts to allege previous flooding that would have made the River

Authority aware that its release of water from Lake Conroe subjected the

homeowners' particular properties to damage from flooding or exacerbated

flooding.

## 2. Taking

A taking occurs when the government physically appropriates or invades

private property or unreasonably interferes with the property owner's right to use

---

[62] The River Authority relies on *Toomey v. Texas Department of Transportation* for the proposition that "[w]hile nonrecurrent flooding may cause damage, a single flood event does not generally rise to the level of a taking." No. 01-05-00749-CV, 2007 WL 1153035, at *4 (Tex. App.—Houston [1st Dist.] Apr. 19, 2007, no pet.) (mem. op.) (citing *Gragg*, 151 S.W.3d at 555). We note that *Gragg* did not purport to draw a bright-line rule requiring proof of recurrence for all takings claims based on flooding, and there is substantial basis for questioning the validity of such a rule. *See, e.g.*, Richard A. Epstein, *Is It a Taking When the Government Floods Your House?* (June 22, 2018), *available at* http://fedsoc.org/events/is-it-a-taking-when-the-government-floods-your-house (last visited Nov. 20, 2018); Ilya Somin, *Is federal government flooding of Houston homes a taking?* VOLOKH CONSPIRACY (Oct. 31, 2017), *available at* http://www.washingtonpost.com/news/volokh-conspiracy/wp/2017/10/31/is-federal-government-flooding-of-houston-homes-a-taking (last visited Nov. 20, 2018) ("It makes little sense to claim that a one-time flood can never be a taking regardless of how deliberate it was or how much damage it inflicts.").

and enjoy it.[63] A takings claimant must plead and prove that the government's intentional acts were the proximate cause of the taking or damaging of the property.[64]

The River Authority argues that the homeowners have not adequately pleaded a taking. It contends that the homeowners have alleged only in conclusory fashion that the release of water from Lake Conroe was the proximate cause of their damages. The River Authority further suggests the pleadings are deficient because the homeowners' properties were affected by a confluence of water that included rainfall, because the peak release of water from Lake Conroe was less than its peak inflow, and because the water was released directly into the West Fork of the San Jacinto River, rather than directly onto their property.

Once again we cannot agree with the River Authority's characterization of the homeowners' extensive and detailed factual allegations as conclusory. The theory of causation is straightforward: in the middle of a hurricane, the River Authority released water from Lake Conroe, causing the foreseeable flooding (or exacerbation of flooding) of specific homes downstream. That theory of a takings

---

[63]     *Gragg*, 151 S.W.3d at 554.

[64]     *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 483–84 (Tex. 2012).

claim has been recognized by the Supreme Court.[65] In support of this theory, the homeowners alleged that their property was damaged when the flooding reached their property, and it would not have flooded but for the water released by the River Authority. In particular, they alleged that their property would not have flooded under natural conditions. In the alternative, they alleged that the flooding they experienced was far worse than it would have been under natural conditions. The homeowners also alleged that due to the acts of the River Authority, the flooding arrived more quickly and with less warning than otherwise would have occurred. When the floodwaters did arrive, the homeowners alleged that they arrived with more force and velocity, and with higher flow rates, than otherwise would have occurred under natural conditions. As a result, the homeowners alleged that the flooding at their property was deeper than otherwise would have occurred, and it lasted for a longer period of time.

Relying heavily on evidence that has no bearing on a court's consideration of a Rule 91a motion to dismiss, the River Authority argues that the flooding resulted from a confluence of water from multiple sources and therefore cannot constitute a taking. To the extent this argument depends on extrinsic evidence, such as the suggestion that peak inflow into Lake Conroe exceeded peak outflow, we may not consider it.

---

[65]     *See Gragg*, 151 S.W.3d at 551–55.

29

To the extent the River Authority's argument is confined to the pleadings and depends on *Wickham v. San Jacinto River Authority*[66] for the proposition that a takings claim is precluded by the allegation that the water was released into the West Fork of the San Jacinto River and became mixed with water from other sources before flooding the homeowners' properties, we are not persuaded. *Wickham* is inconsistent in this regard with the later-decided *Gragg* case, which affirmed a takings judgment despite evidence that a water district released lake water directly into a river during heavy rains and the water traveled about eight miles downstream before causing flood damage.[67]

The River Authority argues that *Kerr* shields it from takings liability because the flooding was the result of a "confluence of particular circumstances" that included other water sources that may have impacted the flooding.[68] *Kerr*, however, arose from a substantially dissimilar factual scenario and involved "whether governmental entities that engage in flood-control efforts are liable to homeowners who suffer flood damage, on the theory that the governments effected a taking of the homeowners' property by approving private development without

---

[66]    979 S.W.2d 876 (Tex. App.—Beaumont 1998, pet. denied).

[67]    *Gragg*, 151 S.W.3d at 550, 554–55; *see also Ark. Game & Fish Comm'n*, 568 U.S. at 27–28, 133 S. Ct. at 515–16 (holding that property owner 115 miles downstream from dam could maintain federal takings claim).

[68]    *See Kerr*, 499 S.W.3d at 799, 807.

fully implementing a previously approved flood-control plan."[69] The dissimilar "attenuated" and "confluence of particular circumstances" in *Kerr*, with the only affirmative conduct allegedly causing the flooding being the approval of private development, and its explicit distinction of an intentional act that causes flooding, do not foreclose the homeowners' takings claims as a matter of law.[70]

### 3. Public use

The River Authority also contends that the homeowners failed to sufficiently plead the public-use element of their takings claims.[71] A taking is for public use if it is necessary to advance or achieve the intended public use.[72] The basis for requiring adequate compensation for a taking is that the government should not "'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"[73]

Regarding the public-use element, the homeowners alleged that in the face of Hurricane Harvey and other circumstances, the River Authority faced a choice.

---

[69]     *Id.* at 795.

[70]     *Id*. at 806–07.

[71]     *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 820 (Tex. 2009).

[72]     *Clear Lake City Water Auth. v. Clear Lake Country Club, L.P.*, 340 S.W.3d 27, 34 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

[73]     *Steele v. City of Houston*, 603 S.W.2d 786, 789 (Tex. 1980) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960)).

The River Authority could do nothing as the water level rose and accept all the associated risks. Or it could release floodwaters that it knew would cause "devastating flooding downstream" with "catastrophic consequences." The River Authority "chose the latter option and intentionally, knowingly, affirmatively and consciously inundated, flooded, took, inversely condemned and sacrificed" the homeowners' property for the greater public good.

The homeowners also alleged that the River Authority's intentional, knowing, affirmative, and conscious acts, conduct, and decisions were done for public use. They alleged that the River Authority's management and operation of the lake, dam, and related infrastructure, combined with its release of water between late August and early September 2017, was done for public use because the governmental actions protected the stability and integrity of the dam, its earthen embankment, and other infrastructure; ensured that the lake would continue to be available for use as a reservoir for critical freshwater storage and for recreational activities and sporting uses like boating and fishing once the storm and its effects had passed; protected and spared homes and other properties on the lake and upstream from flooding; minimized the danger to the public by keeping docks, bulkheads, small islands, and other structures unsubmerged for as long as possible; minimized the danger to the public associated with electrical outlets and equipment coming into contact with water; and enabled the lake, adjacent parks, and adjacent

32

roads to reopen and become fully operational as quickly as possible for the public's benefit.

The River Authority asserts that the release of water from Lake Conroe during Hurricane Harvey was not for a public purpose because, as noted in *Wickham*, its government-mandated powers do not include functioning as a flood control facility.[74] *Gragg*, however, refutes this argument. In that case, the water district's function was similar.[75] Nevertheless, the Supreme Court held that the evidence supported the findings that the extensive damage the takings claimant experienced was "the inevitable result of the reservoir's construction and of its operation as intended."[76]

The River Authority also relies on *Texas Highway Department v. Weber*, which involved the unintended and negligent burning of the takings claimant's hay

---

[74] *Wickham*, 979 S.W.2d at 878 ("It is undisputed that Lake Conroe functions as a water storage reservoir for the City of Houston, other residential areas, and a variety of surrounding business enterprises. Neither Lake Conroe nor its Dam was designed to function as a flood control facility, but simply exists to maintain a level of water so as to supply its customers with a previously contracted amount of water.").

[75] *Gragg*, 151 S.W.3d at 550 ("The reservoir was not constructed to control floods but to supply water. Consistent with its intended function, the District keeps the reservoir as full as possible at a level only two feet below the overflow point.").

[76] *Id.* at 555.

crop that could not have been done for any conceivable public use,[77] but that case is not comparable to the homeowners' claim of intentional flooding of their properties to avoid flood damage to the dam, the lake's infrastructure, and properties on the lake and upstream.[78] Finally, we note that the River Authority admits in its brief that it "released water from the dam on Lake Conroe in order to prevent a failure of the dam due to substantial inflow resulting from Hurricane Harvey."

We conclude that the homeowners have sufficiently pleaded the public-use element of their constitutional takings claims. The same allegations also sufficiently support the homeowners' constitutional takings claims for an "inundation, flood, flowage or drainage easement over their property," or a partial taking.[79]

---

[77] 219 S.W.2d 70, 70–71 (Tex. 1949).

[78] *See City of El Paso v. Mazie's, L.P.*, 408 S.W.3d 13, 24–25 (Tex. App.—El Paso 2012, pet. denied) (finding sufficient the allegation that "the City constructed a diversion dam and drainage system for the purpose of diverting floodwaters from affluent residential neighborhoods into a drainage system that inevitably caused flooding of downstream properties").

[79] *See Hubler v. City of Corpus Christi*, 564 S.W.2d 816, 821 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.).

We hold that the homeowners have sufficiently pleaded their constitutional takings claims.[80] Having done so, they also sufficiently pleaded a statutory takings claim under subsection 2007.002(5)(A) and thus pleaded a waiver of governmental immunity under Chapter 2007.[81]

## D.    Chapter 2007 market-value reduction (§ 2007.002(5)(B))

The homeowners also contend that their factual allegations establish their statutory takings claims that the River Authority's actions affected their private real property by restricting or limiting their rights to their property,[82] and that such actions were the producing cause of a reduction of at least 25 percent in the market value of the affected homes because of the floodwater damage and the diminution in value as a result of the flood stigma and the risk of flooding caused by future releases of lake water by the River Authority.[83] These allegations, coupled with the homeowners' other takings allegations, sufficiently state statutory takings claims

---

[80]    *See City of Socorro v. Campos*, 510 S.W.3d 121, 133–34 (Tex. App.—El Paso 2016, pet. denied).

[81]    *See Guthrie*, 332 S.W.3d at 589–90.

[82]    TEX. GOV'T CODE § 2007.002(5)(B)(i).

[83]    *Id.* § 2007.002(5)(B)(ii).

35

under subsection 2007.002(5)(B).[84] We therefore overrule the River Authority's challenge to the homeowners' Chapter 2007 statutory takings claims.

## Conclusion

We vacate the district courts' orders denying the River Authority's motions to dismiss as to the homeowners' inverse-condemnation claims, which we dismiss without prejudice because the trial courts lack subject-matter jurisdiction over them. We affirm the trial courts' denials of the River Authority's motions to dismiss as to the homeowners' Chapter 2007 statutory takings claims.

Michael Massengale
Justice

Panel consists of Justices Jennings, Higley, and Massengale.

---

[84]     *See Guthrie*, 332 S.W.3d at 590.