# IN THE SUPREME COURT OF TEXAS

═══════

NO. 19-0400

═══════

SAN JACINTO RIVER AUTHORITY, PETITIONER,

v.

VICENTE MEDINA, ASHLEY MEDINA AND ARIS ANTONIOU,
RESPONDENTS

═══════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════════════════════

*~consolidated with ~*

═══════

NO. 19-0401

═══════

SAN JACINTO RIVER AUTHORITY, PETITIONER,

v.

MICHAEL A. BURNEY, ET AL., RESPONDENTS

═══════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════════════════════

*~consolidated with ~*

SAN JACINTO RIVER AUTHORITY, PETITIONER,

v.

CHARLES J. ARGENTO, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

**Argued October 6, 2020**

JUSTICE DEVINE delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE BUSBY, JUSTICE BLAND, and JUSTICE HUDDLE joined.

JUSTICE BLACKLOCK filed a dissenting opinion.

During Hurricane Harvey in 2017, the San Jacinto River Authority released water from its Lake Conroe reservoir into the San Jacinto River. Contending that this release caused or contributed to the flooding of their properties, downstream property owners filed three multi-party suits in two different district courts, asserting both common-law inverse condemnation claims under Article 1, Section 17 of the Texas Constitution and statutory takings claims under Chapter 2007 of the Government Code. These cases reach us as interlocutory appeals from trial

court orders denying the River Authority's motions to dismiss the three suits. The three cases have been consolidated for purposes of this appeal.[1]

The issue we must decide is whether Chapter 2007 applies strictly to regulatory takings, as the River Authority maintains, or whether it may also apply to a physical taking, as the property owners contend. The court of appeals affirmed the trial courts' orders, which denied the River Authority's motions to dismiss, concluding that Chapter 2007's statutory takings claim included the physical takings claim alleged in the property owners' pleadings. *San Jacinto River Auth. v. Burney,* 570 S.W.3d 820 (Tex. App. —Houston [1st Dist.] 2018). We agree and affirm.

# I

The San Jacinto River Authority is a conservation and reclamation district created in 1937 as a political subdivision of the State of Texas.[2] The River Authority has many responsibilities, including "storing, controlling, and conserving storm and floodwaters of the San Jacinto River and its tributaries."[3]

In 1973, the River Authority completed the construction of an earthen dam across the West Fork of the San Jacinto River to create Lake Conroe. The River Authority has operated

---

[1] Cause No. 19-0400, *San Jacinto River Auth. v. Vicente Medina, Ashley Medina, and Aris Antoniou*; Cause No. 19-0401, *San Jacinto River Auth. v. Michael A. Burney, Ginger R. Burney, Charles A. Casey, Maureen S. Casey, John M. Daniel, Carolyn F. Daniel, Robert C. Miles, Sherry K. Miles, Jack L. Nowlin, Linda S. Nowlin, Barry L. Shepherd, Becky A. Shepherd, Charles H.F. Wherry, Diane S. Wherry, Rodney M. Wolf, and Nancy L. Wolf*; and Cause No. 19-0402, *San Jacinto River Auth. v. Charles J. Argento, Katharine Argento, Kristofer D. Buchan, Melissa Buchan, Brandon Burgess, Diane Burgess, Jeff Ensley, Anne Ensley, John Faulkinberry, Laurie D. Faulkinberry, John R. Freeman, Barbara Freeman, Kurt V. Huseman, Debbie L. Huseman, William E. Lange, Jennifer Wood Lange, David L. Miller, Sally T. Miller, Willaim J. Napier, Jr., Christine D. Napier, James R. Revel, Louise W. Revel, Bernard F. Ryan, Cecilia M. Ryan, Dana M. Stegall,* Danny C. *Stegall, Todd R. Sumner, and Kimberly A. Sumner.*

[2] Act of May 12, 1937, 45th Leg., R.S., ch. 426, § 1, 1937 Tex. Gen. Laws 861, 861 (creating the San Jacinto River Conservation and Reclamation District). The District was renamed the "San Jacinto River Authority" in 1951. Act of May 14, 1951, 52nd Leg., R.S., ch. 366, § 1, 1951 Tex. Gen. Laws 617, 617.

[3] Act of May 12, 1937, 45th Leg., R.S., ch. 426, § 3(c), 1937 Tex. Gen. Laws 861, 862.

and maintained the lake and dam since that time. The dam is about thirty miles north of the property owners' homes and properties.

The property owners allege that during Hurricane Harvey in late August and early September 2017, the River Authority released rising water from Lake Conroe into the West Fork of the San Jacinto River, causing or exacerbating the downstream flooding of their properties. They seek damages from the River Authority in three separate lawsuits in Harris County district courts. Each suit alleges takings claims under both the Texas Constitution[4] and the Private Real Property Rights Preservation Act, which is codified as Chapter 2007 of the Texas Government Code.[5]

The River Authority filed Rule 91a motions to dismiss the property owners' suits on grounds of governmental immunity. *See* TEX. R. CIV. P. 91a. The district courts denied the motions, and the River Authority appealed. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing an interlocutory appeal from an order on the government's jurisdictional plea). In that appeal, the River Authority raised a new jurisdictional argument, asserting that the county civil courts at law in Harris County possessed exclusive, original jurisdiction over eminent domain proceedings. *See* TEX. GOV'T CODE § 25.1032(c) ("A county civil court at law has exclusive jurisdiction in Harris County of eminent domain proceedings, both statutory and inverse.").

The court of appeals agreed that the district courts of Harris County lacked jurisdiction over the property owners' inverse-condemnation claims and dismissed them without prejudice to

---

[4] *See* TEX. CONST. art. I, § 17 ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation . . .").

[5] *See* TEX. GOV'T CODE § 2007.021 (authorizing suit to determine whether a taking has occurred under Chapter 2007).

4

refile in the proper court. 570 S.W.3d at 838–39. Concluding that the district courts otherwise possessed jurisdiction to determine the property owners' statutory takings claims under Chapter 2007, the court of appeals affirmed the trial courts' decision not to dismiss them. *Id.* at 839; *see also* TEX. GOV'T CODE § 2007.021(a) (stating that takings claims under the chapter "must be filed in a district court"). The River Authority's petition for review to this Court complains that the appellate court erred in not also dismissing the property owners' statutory claims because the taking alleged in their pleadings is outside Chapter 2007's scope and limited waiver of sovereign immunity.

**II**

Sovereign and governmental immunity protect the state and its political subdivisions, respectively, from suit and liability absent the state's express waiver. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 93 (Tex. 2012). Chapter 2007's Property Rights Act waives that immunity "to the extent of liability created by this chapter" by authorizing a property owner to bring suit "to determine whether the governmental action of a political subdivision results in a taking under this chapter." TEX. GOV'T CODE §§ 2007.004(a), .021(a). The Act defines the term "taking" to include governmental actions compensable as takings under the state and federal constitutions, as well as less intrusive governmental actions that cause "a reduction of at least 25 percent in the market value of the affected private real property." *Id.* § 2007.002(5). The Property Rights Act further enumerates the governmental actions to which it applies, while specifying fourteen governmental actions to which it does not apply. *Id.* § 2007.003.

The River Authority makes a twofold argument that the Act's waiver of governmental immunity does not apply to its decision to release water from the Lake Conroe reservoir. First, it

5

contends that the Act applies only to regulatory takings and not the physical taking alleged by the property owners; that is, the flooding allegedly caused by the River Authority. Alternatively, the Authority maintains that even if the Act might be construed to cover a physical taking, its actions here are nevertheless excluded because they were responsive to "a grave and immediate threat to life and property." *See id*. § 2007.003(b)(7). We consider these arguments in turn.

**III**

The River Authority contends that Chapter 2007 applies to regulatory takings only. Takings may be classified as either physical or regulatory. *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004). A physical taking occurs when the government literally takes property from its owner, such as when it "authorizes an unwarranted physical occupation of an individual's property." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). A regulatory taking occurs when the government restricts a property owner's rights to such an extent as to become the functional equivalent of a physical seizure. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 490 (Tex. 2012). The River Authority maintains that a fair reading of the chapter indicates (1) that the liability created here is only for regulatory takings (not the physical taking alleged in the property owners' pleadings) and (2) that governmental immunity is waived only for suits to invalidate and rescind such regulations.

The court of appeals disagreed. It "reject[ed] the River Authority's contention that Chapter 2007 applies only to regulatory takings and does not apply to physical takings, such as flooding," noting that "the statute expressly applies to a governmental action 'that imposes a physical invasion . . . of private real property.'" 570 S.W.3d at 832 (quoting TEX. GOV'T CODE § 2007.003(a)(2)). The court relied further on the chapter's broad definition of "taking." That

6

definition includes both regulatory and physical takings. *See id*. at 831 (noting the inclusion of compensable takings under both the state and federal constitutions in the statutory definition). The court accordingly concluded that the property owners' allegations of a physical taking were sufficient to invoke the chapter's waiver of governmental immunity. *Id*. at 832.

The River Authority maintains that the court of appeals has misinterpreted the physical-invasion provision to expand the chapter's scope to physical takings. It concedes, however, that governmental actions that impose a "physical invasion" of real property can refer to either a physical or regulatory taking. But in the context of this statute, it reasonably refers only to the latter, according to the River Authority.

The statute states that the chapter "applies only to the following governmental actions:"

(1) the adoption or issuance of an ordinance, rule, regulatory requirement, resolution, policy, guideline, or similar measure;

(2) *an action that imposes a physical invasion* or requires a dedication or exaction *of private real property*;

(3) an action by a municipality that has effect in the extraterritorial jurisdiction of the municipality, excluding annexation, and that enacts or enforces an ordinance, rule, regulation, or plan that does not impose identical requirements or restrictions in the entire extraterritorial jurisdiction of the municipality; and

(4) enforcement of a governmental action listed in Subdivisions (1) through (3), whether the enforcement of the governmental action is accomplished through the use of permitting, citations, orders, judicial or quasi-judicial proceedings, or other similar means.

TEX. GOV'T CODE § 2007.003(a)(1)–(4) (emphasis added). Because each action on the list can refer to a regulatory taking, the River Authority argues that "physical invasion" should be interpreted similarly and not as an outlier, different in type from the other enumerated actions. Although a physical invasion can refer to either a physical or regulatory taking, the River

7

Authority contends that the words here refer only to regulatory takings, like the actions of "dedication" or "exaction," which appear along with physical invasion in Section 2007.003(a)(2). *See Hearts Bluff Game Ranch*, 381 S.W.3d at 477 n.20 (referring to the terms exaction and dedication as "somewhat distinct types of regulatory takings matters"). Moreover, interpreting "physical invasion" to reference a regulatory taking only is consistent with the other enumerated governmental actions, which the River Authority submits are also regulatory in nature. *See* TEX. GOV'T CODE § 2007.003(a)(1), (3). Finally, the River Authority observes that "the text does not include the primary mode for physical takings: a condemnation petition filed in court," citing section 21.012 of the Texas Property Code.

Indeed, it does not. In fact, the chapter expressly excludes formal condemnation proceedings from its scope. *See* TEX. GOV'T CODE § 2007.003(b)(8) (excluding "a formal exercise of the power of eminent domain" from the chapter). Condemnation is the formal process by which private property is taken for a public use without the owner's consent, but on the payment of adequate compensation. *See* TEX. PROP. CODE § 21.012 (stating the requirements for a condemnation petition); 17 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE §§ 261.40–.47 (2020) (discussing procedure for exercising eminent domain power). When the government takes or damages property without first initiating formal condemnation proceedings, however, the owner of private property may bring a common-law action for inverse condemnation. *State v. Brownlow*, 319 S.W.3d 649, 652 (Tex. 2010) (citing *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex. 1992)). The action is referred to as inverse because the property owner initiates a common-law action to recover compensation for a taking that has already occurred instead of the government initiating a formal statutory proceeding to determine

8

appropriate compensation for a prospective taking. *City of Dallas v. Stewart*, 361 S.W.3d 562, 567 (Tex. 2012). But as noted, Chapter 2007 expressly excludes formal condemnation proceedings. TEX. GOV'T CODE § 2007.003(b)(8). It does not similarly exclude claims for inverse condemnation.

The property owners argue that the exclusion of formal condemnation proceedings from the chapter, which the River Authority describes as "the primary mode for physical takings," confirms that Chapter 2007's application is not limited to regulatory takings. They submit that this exclusion is rendered superfluous under the River Authority's proposed limitation of the chapter to regulatory matters. It merely excludes that which the River Authority maintains is not included to begin with. The property owners argue that the exclusion has meaning only if Chapter 2007 otherwise applies to non-regulatory physical invasions that result in a physical taking of real property. The Legislature could have excluded all non-regulatory physical invasions of real property from the chapter's scope, just as it excluded the "formal exercise of the power of eminent domain" and thirteen other actions, many of which the property owners submit also include non-regulatory, physical takings. *See, e.g.*, *id*. § 2007.003(b)(2), (3), (6), (7), (8), and (13).

The property owners also maintain that the statute's physical-invasion provision expressly states what these statutory exclusions imply, that the chapter does not apply solely to regulatory takings. The chapter instead applies to non-regulatory governmental actions, such as the water release from the reservoir that flooded their properties and thus "impose[d] a physical invasion . . . of private real property." *Id*. § 2007.003(a)(2). The property owners conclude that construing the physical-invasion provision to include physical takings gives meaning to that text

9

and harmonizes it with the chapter's suit-authorization language, *id*. § 2007.021(a), and taking's definition, *id*. § 2007.002(5). We agree.

The chapter provides that private property owners may bring suit to determine whether governmental action results in a "taking under this chapter." *Id*. § 2007.021(a). "Taking" is defined broadly to include governmental actions that satisfy the takings standard under the federal or state constitution or that reduce the market value of the affected property by at least 25 percent. *Id*. § 2007.002(5). A compensable taking under the state or federal constitution can be physical or regulatory. *Gragg*, 151 S.W.3d at 554. And we have held under somewhat similar circumstances that a political subdivision's decision to flood downstream properties for a public purpose can be compensable as a physical taking under the Texas Constitution. *Id*. at 554–55 (citing TEX. CONST. art. I, § 17). Chapter 2007 thus authorizes a statutory takings suit for governmental actions that constitute takings under the state or federal constitution (either physical or regulatory) or that cause a reduction of at least 25 percent in market value.

The River Authority does not deny the breadth of these provisions, nor does it deny that "physical invasion" may refer to a physical taking. Rather, it argues that a physical invasion can also be the consequence of a regulatory taking and that we should construe the language here to reference only that type of taking because that construction better fits the statutory scheme and its remedies. For example, Subchapter C of the statute envisions an orderly process through which a political subdivision proposes a covered governmental action that may result in a taking, prepares a written takings impact assessment of that action, and provides a 30-day public notice of its intentions. TEX. GOV'T CODE §§ 2007.042 (public notice), .043 (takings impact assessment). If the governmental action is found to be a taking under the chapter, the "property

10

owner is only entitled to, and the governmental entity is only liable for, invalidation of the governmental action." *Id*. § 2007.023. The chapter does not obligate the governmental entity to pay damages. Instead, the River Authority submits that this statutory scheme establishes a new procedure for preventing excessive regulatory takings before they occur, allowing for a single remedy: a judgment rescinding the challenged action. *Id*. § 2007.024(a). It submits that these requirements cannot be satisfied during a tropical storm and that the chapter's remedy is of no benefit to the property owners, in any event, because they seek only damages caused by the flooding.

The Attorney General makes a similar argument as amicus curiae in support of the River Authority's petition for review. The Attorney General argues that the property owners lack standing under Chapter 2007 because the chapter offers them no prospect of redress. The only relief the property owners seek is an award of damages, and that is the only relief that can redress their alleged injuries. But the chapter does not include the judicial power to award damages. The chapter's only remedy for a taking is invalidation and rescission, which, the Attorney General argues, is not possible here. The River Authority echoes this sentiment. It argues that Chapter 2007's declaratory remedies serve a purpose only when a regulatory taking can be undone and that here it cannot rescind the floodwaters back into the reservoir.

We agree that Chapter 2007 does not obligate a governmental entity to pay damages. We also agree that rescission is not what the property owners seek. But we do not agree that rescission is the only remedy available to a prevailing property owner under the chapter. Chapter 2007 plainly provides for more than just rescission. *See id*. § 2007.006(a) ("The *remedies* provided by this chapter are in addition to other procedures or remedies provide by

11

law." (emphasis added)). For example, the property owners may sue to adjudicate whether governmental actions result in a taking under the chapter, *id*. § 2007.021; they are entitled to a "takings" determination made by the trier of fact, *id*. § 2007.023(b); they are entitled to invalidation of the governmental action resulting in the taking, *id*.; they are entitled to a judgment that "include[s] a fact finding that determines the monetary damages suffered by the private real property owner as a result of the taking," *id*. § 2007.024(b); and they are entitled to an award of attorneys' fees and costs, if they prevail, *id*. § 2007.026(a). Thus, even though damages are not generally available[6] under the chapter, the statute does provide additional relief beyond that available to the property owners at common law for inverse condemnation.

The Dissent, however, would relegate the property owners to their constitutional remedy under the takings clause and dismiss their statutory claims for lack of jurisdiction. *Post* at ___. The Dissent submits that the most the property owners can hope to achieve under their statutory claim is a judicial determination that the flooding of their homes was a taking and the cause of an identified amount of damages. *Id*. at ___. It describes these determinations as "abstract" and of "no practical effect" without the government's consent. *Id*. at ___. But the government has consented to this suit and to liability, and whether it chooses to pay the amount of damages determined under the statute is not a matter of jurisdictional concern.

The state has waived its immunity from suit and liability "to the extent of liability created by [Chapter 2007]" and has authorized suits against its political subdivisions to determine "whether the governmental action of a political subdivision results in a taking under this

---

[6] A judgment, final decision, or order under Chapter 2007, Subchapter B, must include a fact finding of the monetary damages caused by the taking, but the governmental entity is not obligated to pay those damages. TEX. GOV'T CODE § 2007.024(b). If the governmental entity does not wish to rescind the action that caused the taking, however, it "may elect to pay the damages as compensation" and its "immunity to liability is waived to the extent the governmental entity elects to pay." *Id*. § 2007.024(c).

chapter." TEX. GOV'T CODE §§ 2007.004(a), .021(a). If the property owner can establish a taking under the statutory definition, the property owner is entitled to invalidation of the governmental action resulting in the taking. *Id*. § 2007.023(b). The chapter further provides for alternative remedies of either rescission or damages for the taking. *Id*. § 2007.024. Damages are payable at the governmental entity's election from funds appropriated to it. *Id*. § 2007.024(c), (f).

Because the Dissent views the government's election to pay damages as unlikely and the rescission of prior governmental action as inconsequential, it concludes that any judgment the court might render would be "merely advisory" and intrude on the other branches of government. *Post* at ___ (citing *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 488 (Tex. 2018)). But it is the Legislature that has waived immunity from suit and liability for statutory takings and provided for these alternative remedies. That the government might decline to pay damages is no reason to dismiss the pending suits on jurisdictional grounds. Even if the statute had not waived immunity from liability to determine these damages, that would not affect a court's jurisdiction. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam) (explaining that immunity from liability is an "affirmative defens[e]" that "does not affect a court's jurisdiction to hear a case"). The Dissent's contrary rule would nullify many legislative grants of permission to sue, as any resulting suit against the government would fail the Dissent's redressability test if the government retains immunity from liability or limits collectability or enforcement of a judgment. *See, e.g.,* TEX. CIV. PRAC. & REM. CODE §§ 101.107(a), 101.109, 107.002(b), 114.001; *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 414 (Tex. 1997) (Hecht, J.,

13

concurring) (noting that even without "governmental immunity from contract suits, successful plaintiffs still could not be paid without legislative appropriation").

Nor is it a reason to dismiss the statutory claim merely on the possibility that the constitution may provide the desired remedy. The taking defined by the chapter is broader than that cognizable under the constitution, and the remedy the statute provides may be all that is available to some of the property owners in these suits.

The statutory remedies are cumulative of other law but, of course, cannot be used to recover twice "for the same economic loss." TEX. GOV'T CODE § 2007.006(b). Moreover, the definition of "taking" does not say that the offending governmental action must be rescindable, continuous, or recurring, but instead provides that it may be actionable even though temporary or permanent. *Id*. § 2007.002(5)(A). Thus, we conclude that the statute's rescission remedy, while most relevant to a regulatory taking, does not otherwise modify or limit the scope of an actionable taking under the chapter or provide the basis for dismissal on jurisdictional grounds.

Similarly, the requirements and formal procedures that apply to proposed governmental action under Subchapter C of the statute do not limit the chapter's scope to regulatory takings only. Subchapter C may be concerned with regulatory matters, providing as it does for a takings impact assessment and public notice of proposed governmental action. But Subchapter C independently provides for a suit to invalidate governmental action, stating that "[a] governmental action *requiring a takings impact assessment* is void if an assessment is not prepared." *Id*. § 2007.044(a) (emphasis added). The subchapter authorizes an affected property owner to "bring suit for a declaration of the invalidity of the governmental action" and again provides for an award of reasonable attorney's fees and court costs to a prevailing property

14

owner. *Id*. § 2007.044(a), (c). The subchapter suggests, however, that not every governmental action or taking under Chapter 2007 implicates these requirements. Indeed, the subchapter's title states that its requirements are for "proposed governmental action."

We conclude that Chapter 2007 does not expressly limit its application to regulatory takings nor does it expressly exclude all physical takings from its terms. We note further that Subchapter C, titled "Requirements For Proposed Governmental Action," focuses on prospective regulatory takings and authorizes an affected property owner to "bring suit for a declaration of the invalidity of the governmental action" if the required takings impact assessment has not been done. *Id*. § 2007.044(a). The property owners obviously do not seek relief under that subchapter.

Their suit is instead under Subchapter B to determine whether the physical invasion of their properties by the River Authority's release of floodwaters constitutes a taking. *Id*. § 2007.021(a). As we have observed: "The Property Rights Act creates two causes of action in favor of real property owners: (1) a statutory cause of action for taking; and (2) a cause of action based on governmental action taken without preparing a TIA [takings impact assessment], if the Property Rights Act requires a TIA." *Bragg v. Edwards Aquifer Auth*., 71 S.W.3d 729, 734–35 (Tex. 2002). Subchapter B authorizes a private real property owner to "bring suit under this subchapter to determine whether the governmental action of a political subdivision results in a taking" under the statute. TEX. GOV'T CODE § 2007.021(a). The statute's "General Provisions" in Subchapter A define "taking" to include both physical and regulatory takings, and governmental action to include, among other things, the "physical invasion" of property, which the parties agree may refer to either type of taking. *Id*. §§ 2007.002(5), .003(a)(2).

15

The River Authority nevertheless maintains that the lower courts should have dismissed the property owners' statutory claims because Chapter 2007 does not waive governmental immunity for physical takings, which is all that the property owners have alleged. The court of appeals rejected that notion, and we agree that the chapter does not apply exclusively to regulatory takings. If that were true, no need would exist for several of the chapter's exclusions, including the two that the River Authority argues must apply to the actions it took during the Hurricane Harvey weather emergency. "As a general principle, we eschew constructions of a statute that render any statutory language meaningless or superfluous." *City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 57 (Tex. 2015) (per curiam); *see Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915) ("It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative.").

**IV**

We next consider the application of the statutory exceptions raised by the River Authority in the context of its motion to dismiss under Texas Rule of Civil Procedure 91a.

Chapter 2007 expressly excludes fourteen types of government actions, two of which apply here, according to the River Authority. *See* TEX. GOV'T CODE § 2007.003(b) (listing the governmental actions excluded from the chapter). The chapter does not apply to:

> (7) an action taken out of a reasonable good faith belief that the action is necessary to prevent a grave and immediate threat to life or property;

> * * *

> (13) an action that: (A) is taken in response to a real and substantial threat to public health and safety; (B) is designed to significantly advance the health and

16

safety purpose; and (C) does not impose a greater burden than is necessary to achieve the health and safety purpose[.]

*Id*. § 2007(b)(7), (13). Because Chapter 2007 excludes certain emergency situations and responses, the River Authority argues that its actions here, which were responsive to a weather emergency, preclude the property owners' statutory claims. It concludes that the statutory claims should therefore have been dismissed under Rule 91a, rather than remanded to the trial court.

Rule 91a provides that a party "may move to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1. "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought. A cause of action has no basis in fact if no reasonable person could believe the facts pleaded." *Id*. In ruling on a Rule 91a motion, a court "may not consider evidence . . . and must decide the motion based solely on the pleading of the cause of action." *Id*. 91a.6. We review the merits of a Rule 91a motion de novo. *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016) (per curiam).

The River Authority argues that, as a matter of law and common sense, no reasonable person could believe Hurricane Harvey was not "a grave and immediate threat to life or property" or "a real and substantial threat to public health and safety." TEX. GOV'T CODE § 2007(b)(7), (13). It asks the Court to take judicial notice of the disaster declarations made by the President and Governor to establish that the River Authority was reacting to an emergency situation during the time it allegedly flooded the property owners' homes. The court of appeals declined to take judicial notice of the River Authority's proffered evidence, noting that Rule 91a expressly prohibits a court's consideration of evidence and expressly requires that the motion be

17

decided on the pleadings. 570 S.W.3d at 831. But even without judicial notice, the River Authority maintains that the property owners' pleadings similarly demonstrate that Hurricane Harvey presented an emergency that threatened life and property by indicating that the River Authority's purpose in releasing the water was to protect the integrity of the dam, maintain control over its flood gates, and protect upstream properties from flooding, among other things.

The property owners respond that the factual allegations in their pleadings do not conclusively establish either exclusion. They describe the statutory exclusions as affirmative defenses, which under Rule 91a must "be conclusively established by the facts in a plaintiff's petition." *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 656 (Tex. 2020). They submit that these exclusions raise inherent fact questions, which their pleadings do not resolve. For example, the pleadings do not conclusively establish the (b)(7) exclusion because the property owners have never asserted that the River Authority released water as it did with a reasonable good faith belief that doing so was necessary to prevent a grave and imminent threat to the dam's structure and operation. To the contrary, their pleadings indicate that the River Authority knew the dam could withstand much more rainfall and much higher inflow rates than the watershed rainfall and inflow rates experienced during Harvey and that it also knew the water from Harvey could have been released at much slower rates without damaging the dam or losing control of its floodgates. The River Authority allegedly knew this from another weather event decades earlier, which, according to the property owners, dropped almost twice as much rain in the watershed over a similar four-day period, with corresponding larger peak inflows and yet resulted in much slower and less damaging water release rates. Based on these allegations, the property owners submit a reasonable person could conclude that

18

the River Authority did not have a reasonable good faith belief that it was necessary to release water as it did to prevent a grave and immediate threat to life or property.

The property owners further maintain that the River Authority knew it was unnecessary to release water as it did to "prevent a grave and immediate threat to" the dam and its floodgates because Lake Conroe had the capacity to store additional floodwaters until Harvey passed. In this regard, they note the existence of a flowage easement, which allows the River Authority to store water up to 207 feet above mean sea level "during storm events." The recorded easement "notif[ies] landowners that any structures below this elevation are subject to being flooded."

According to the pleadings, Lake Conroe's water or pool level did not reach 207 feet above mean sea level during the storm. After the water reached its highest level of 206.24 feet, the River Authority began releasing water at record flow rates, reducing the pool level by about three and one-half feet over forty-eight hours and allegedly causing devastating flooding downstream. The property owners thus complain that the River Authority did not use all available capacity to store floodwaters during Harvey, even though it could have done so without threatening the dam's structural integrity. They submit that, as with the allegations regarding rainfall and flow rates, a reasonable person could conclude that the River Authority did not have a reasonable good faith belief that it was necessary to release water as it did to prevent a grave and immediate threat to life or property, based on their pleadings.

The River Authority, however, reads the plaintiffs' pleadings as an admission of its own good faith. It argues that the plaintiffs' pleadings concede that the River Authority released water "to relieve pressure on the dam" and "protect its stability and integrity" and thus conclusively establish its good faith in the matter.

19

Not so, the property owners respond. They submit that these phrases in their pleadings merely refer to the various public purposes supposedly furthered by the River Authority's decision to flood their downstream properties. The court of appeals agreed, summarizing these various public purpose allegations from the pleadings in its opinion:

> Regarding the public-use element, the homeowners alleged that in the face of Hurricane Harvey and other circumstances, the River Authority faced a choice. The River Authority could do nothing as the water level rose and accept all the associated risks. Or it could release floodwaters that it knew would cause "devastating flooding downstream" with "catastrophic consequences." The River Authority "chose the latter option and intentionally, knowingly, affirmatively and consciously inundated, flooded, took, inversely condemned and sacrificed" the homeowners' property for the greater public good.

> The homeowners also alleged that the River Authority's intentional, knowing, affirmative, and conscious acts, conduct, and decisions were done for public use. They alleged that the River Authority's management and operation of the lake, dam, and related infrastructure, combined with its release of water between late August and early September 2017, was done for public use because the governmental actions protected the stability and integrity of the dam, its earthen embankment, and other infrastructure; ensured that the lake would continue to be available for use as a reservoir for critical freshwater storage and for recreational activities and sporting uses like boating and fishing once the storm and its effects had passed; protected and spared homes and other properties on the lake and upstream from flooding; minimized the danger to the public by keeping docks, bulkheads, small islands, and other structures unsubmerged for as long as possible; minimized the danger to the public associated with electrical outlets and equipment coming into contact with water; and enabled the lake, adjacent parks, and adjacent roads to reopen and become fully operational as quickly as possible for the public's benefit.

570 S.W.3d at 837.

The property owners submit that their pleadings do not establish that the River Authority's actions met either the "reasonable good faith belief" test of (b)(7) or the measured-and-appropriate response required by (b)(13). Rather, they submit that the River Authority's reasonable good faith belief that it was necessary to release the water as it did or whether its

actions imposed a greater burden than necessary to protect public safety are fact questions which their pleadings do not answer. *See* TEX. GOV'T CODE § 2007.003(b)(7) (excluding "an action taken out of a reasonable good faith belief that the action is necessary to prevent a grave and immediate threat"); *id*. § 2007.003(b)(13) (requiring that the governmental action "not impose a greater burden than is necessary to achieve . . . safety"). The property owners' pleadings thus put at issue whether it was reasonable or necessary for the River Authority to release the floodwaters as it did.

The pleadings assert that Lake Conroe's water level can exceed 207 feet above mean sea level for a short time without threatening the dam's structural integrity when necessary to minimize risk to life and property on both sides of the dam. The pleadings further compare Harvey to another slow-moving storm decades earlier that the property owners allege produced more rainfall and higher inflow rates, but which the River Authority managed with slower release rates. The pleadings also allege that the River Authority had additional capacity to store Harvey's floodwaters without harm to the dam and note the existence of upstream flood easements for water levels at 207 feet above mean sea level, ostensibly for this purpose. The property owners submit that a reasonable person might therefore conclude that the River Authority could have stored more water and released it more slowly, while protecting the dam's structure and operations. The pleadings thus suggest that the River Authority's experience with the prior extreme weather event bear on the application of these exclusions and the reasonableness of the burden cast on the downstream property owners.

The River Authority vividly responds that "[d]odging a bullet once does not make later gunfire any less life-threatening." Thus, a disaster avoided in a previous storm does not allow

21

reasonable persons to believe Harvey posed no threat to life or property. While that may be true, neither does it establish as a matter of law the elements of the two exclusions at issue. The pleadings indicate that the River Authority's knowledge and past experiences inform the issues of good faith and reasonableness entwined in the two exclusions. The parties have not briefed the meaning of good faith in the context of this statute, and we accordingly express no opinion on the subject. We hold only that the property owners' pleadings do not conclusively establish either statutory exception, which is what Rule 91a demands. The lower courts accordingly did not err in denying the Rule 91a motions to dismiss.

* * * * *

In summary, we hold that Chapter 2007 creates liability and waives governmental immunity for two causes of action: (1) a statutory takings claim under Subchapter B and (2) a suit to rescind proposed governmental action under Subchapter C. We hold further that the statutory takings claim may include a physical taking, such as the flooding alleged by the property owners, and is not limited solely to regulatory takings. Finally, we conclude that statutory exceptions to liability under the chapter are not established by the property owner's pleadings and that the court of appeals therefore did not err in affirming the trial courts' orders, which denied the River Authority's motions to dismiss under Rule 91a.

The judgment of the court of appeals is affirmed.

_____
John P. Devine
Justice

OPINION DELIVERED: April 16, 2021

22